UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DOUGLAS F. CARLSON,

   Plaintiff,

  v.

UNITED STATES POSTAL SERVICE,

   Defendant.

Case No. 15-cv-06055-JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 40, 41

# I. INTRODUCTION

Plaintiff Douglas F. Carlson, proceeding pro se, filed this action against the United States Postal Service ("Postal Service") seeking documents responsive to three requests that he submitted under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The Postal Service responded to the requests after Carlson filed his complaint, producing responsive documents to all three requests. It redacted certain information to which Plaintiff claims he is entitled, however. Presently before the Court are the parties' summary judgment motions ("the Motions"). A hearing on the Motions was held on June 30, 2017 at 9:30 a.m. For the reasons set forth below, the Court GRANTS Carlson's motion for summary judgment and DENIES the Postal Service's motion for summary judgment.[1]

# II. BACKGROUND

## A. Carlson's Activities as a "Postal Watchdog" and a Postal Enthusiast

Carlson is a self-described "postal watchdog and consumer advocate." Declaration of Douglas F. Carlson in Support of Motion for Summary Judgment, Docket No. 42 ("Carlson Motion Decl.") ¶ 1. According to Carlson, "[f]or over 20 years, [he has] advocated for better

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

postal services and lower rates and fees, in Postal Regulatory Commission (PRC) proceedings and in direct communications with the Postal Service." *Id.* ¶ 2.  He estimates that he has written approximately 1,200 letters to the Postal Service relating to service issues.  *Id.* ¶ 8.  He has also submitted hundreds of FOIA requests to obtain records from the Postal Service.  *See* Declaration of Matthew J. Connolly, Esq., Docket No. 40-2 ("Connolly Motion Decl.) ¶ 6 (stating that internal Postal Service records reflect that between February 13, 2012 and February 13, 2017 Carlson submitted 437 FOIA requests to the Postal Service).   According to the Postal Service, he has filed at least six lawsuits against the Postal Service related to his FOIA activity.  Declaration of Janine Castorina ("Castorina Motion Decl.") ¶ 6.

Carlson contends he has "improved collection times in many cities, including Santa Cruz, California" due to his efforts.  *Id.* ¶ 6.  He points to an Oakland Tribune editorial that complimented him personally for his efforts to improve service.  Carlson Motion Decl. ¶ 5 & App. 1 (August 1, 2001 Op-Ed piece entitled "West loses as postal service cuts back" describing "clandestine changes in the U.S. Postal service delivery schedules" that allegedly resulted in inequity to California and other Western states, which were revealed only through "Carlson's persistence" and stating that Carlson "is to be thanked and praised for bringing it to public attention.").

Carlson also considers his interest in the Postal Service to be a hobby and shares his interest with other postal enthusiasts.  *Id.* ¶ 12.   According to Carlson, "[s]ome of these people curate a collection of paper and electronic photographs of post offices nationwide for the Post Mark Collectors Club, which operates a museum in Ohio and an Internet Web site. One person operates his own Web site, Postlandia, which is dedicated to photographs of post offices." *Id.*; *see also* Declaration of Evan Kalish ("Kalish Decl.") ¶ 4 (stating that he manages the Postlandia blog, "which presents stories and photographs of post offices and places across the United States," and also manages "the world's largest online collection of curated post office photographs for the Post Mark Collectors Club (PMCC)" and that "Mr. Carlson has frequently shared with [him] information about his postal interests").

**B.    The Santa Cruz Incident**

On January 10, 2015, the Santa Cruz Sentinel ran an article about the relocation of the East Santa Cruz Station post office ("the East Santa Cruz Station").  Carlson Motion Decl. ¶ 14 (citing http://www. santacruzsentinel.com/ article/ NE/20150110/NEWS/150119986).   The article included pictures of the old post office location and information about the opening of the new post office.  *Id*.  Carlson visited the new location on the afternoon of January 11, 2015, where contractors were getting the new post office ready for business.  *Id*.  ¶ 15.  He observed contractors hanging a sign and transferring stencils to the window.  *Id*.  Carlson considered these preparations to open the new post office newsworthy and therefore took photographs and videos of these activities while standing in a parking lot of an adjacent shopping center.  *Id*.; *see also* Carlson Reply, Docket No. 51 at 12 ("Plaintiff does not believe he was standing on defendant's property on January 11, 2015").

As Carlson was making a video recording, a "woman inside the building, whom [Carlson] had encountered when [he] first arrived at the site, asked [him] why [he] was taking photographs." *Id*.  ¶ 16.  Carlson responded that he was taking photographs "just for personal interest" and explained that he had "never actually watched a post office being built."  *Id*.  According to Carlson, the woman asked him for his name.  *Id*.  He further contends that after he provided his name, the woman said "in a negative tone of voice, 'That name sounds familiar'" and then disappeared from view inside the building.  *Id*. [2]

A few minutes later, another woman approached Carlson from behind, held a cellular phone "not more than two or three feet from [his] face," and said, "Smile."  *Id.* ¶ 17.  According to Carlson, after she took at least one photograph of him, the woman walked into the post office and started talking with the woman who had first spoken to Carlson.  *Id*.  Carlson states in his

---

[2] According to Claire Cormier, who represents the Postal Service in this action, she has reviewed the two videos taken by Carlson that day and while some "interaction with a postal employee" can be heard, neither video includes the part of the exchange where Carlson was asked his name and the employee said that his name sounded familiar.  *See* Supplemental Declaration of Claire Cormier ("Cormier Supp. Decl.") ¶ 3.   At oral argument, however, the Postal Service stipulated that it does not dispute that the conversation described by Carlson took place.  Carlson, in turn, explained that by the time this conversation occurred he had already stopped videotaping.

declaration that he saw that the individual who had photographed him was carrying a plastic card that he believed was an identification badge. *Id.* The badge was mostly white but Carlson states that he could see "United States of America" in small letters. *Id.* He further states that the woman who photographed him did not ask him his name but that enough time had passed from the time the woman inside had asked Carlson his name for that individual to call the person who took pictures of him and tell the photographer his name. *Id.*

According to Carlson, immediately after the woman stopped photographing him, he left the post office, fearing that the photographer was a postal inspector "and the Postal Service planned to open a criminal investigation of or prosecution against [him] for violating an unknown law or regulation or for another reasons." Third Declaration of Douglas Carlson ("Carlson Reply Decl.") ¶ 2.

Carlson sent some of the photographs that he had taken of the East Santa Cruz Station to Evan Kalish, who operates the Postlandia blog, and Kalish included them in his blog in a section entitled "Under Construction." Carlson Motion Decl. ¶ 23; Kalish Decl. ¶ 8. The post included "before and after" pictures of the East Santa Cruz Station post office. Kalish Decl. ¶ 8. According to Carlson, the blog post included a link to Carlson's Flickr account, which "counted over 160 of some photographs and each of two videos." Carlson Motion Decl. ¶ 23.

### C. Carlson's Efforts to Obtain Information about the Santa Cruz Incident

The next day, on January 12, 2015, Carlson returned to the East Santa Cruz Station to look for the two women involved in the incident described above ("Incident" or "Santa Cruz Incident") and identify them. *Id.* ¶ 18. Carlson did not see the women, and so he contacted a supervisor, Tung Tran, who informed Carlson that the women would have come from the main Santa Cruz post office. *Id.* According to Carlson, Tran refused to provide him with the name of any supervisors or managers of customer service at the Santa Cruz post office. *Id.*

On January 13, 2015, Carlson called the Santa Cruz post office and talked to officer-in-charge Jae An, who told Carlson that he was "unfamiliar with the incident" and that none of his staff had been at the East Santa Cruz Station on January 11, 2015. *Id.* ¶ 19. He told Carlson and

that the person he had seen inside the post office might have been an independent contractor.[3] *Id.*

On January 14, 2015, Carlson sent an email to Claire T. Cormier, who was representing the Postal Service in a FOIA case unrelated to the present matter (hereinafter, the "6017 Case"), to seek assistance in identifying the individuals involved in the Incident. Declaration of Claire T. Cormier, Docket No. 40-3 ("Cormier Motion Decl.") ¶ 3 & Ex. A; *see also Carlson v. United States Postal Service,* no. 13-cv-6017-JSC, 2015 WL 9258072, *1 (N.D. Cal. Dec. 18, 2015). Carlson and Cormier were scheduled to meet two days later at a settlement conference in an unrelated FOIA case against the Postal Service. *Id.* Ex. A. In the email, Carlson stated that "[a] resolution of this question may assist settlement discussions on Friday." *Id.* After describing the Incident, Carlson stated that he wanted to know the name and title of both the woman inside the post office who had asked him his name and the woman who took his photograph. *Id.* Regarding the woman who had photographed him, Carlson explained that "[a]lthough her conduct was legal, [he] wish[ed] to complain to an appropriate party in the Postal Service about her actions, which were confrontational and intimidating toward a member of the public who was engaged in a legal, constitutionally protected activity." *Id.*

The parties attended the January 16, 2015 settlement conference. Carlson Motion Decl. ¶ 21. According to Carlson, at the settlement conference, attorneys Sara Snyder and Jeremy Watson discussed the Incident with Carlson but did not disclose the identities of the individuals involved in it. *Id.*[4]

On January 21, 2015, Carlson submitted a FOIA request to the Postal Service ("First FOIA Request") asking that the Postal Service to "provide all photographs that a postal employee took of [him] on Sunday, January 11, 2015 . . . and all records related thereto, including . . . any . . . records that will identify the name of the person who uses the device(s) that photographed me."

---

[3] At oral argument, the Postal Service stipulated that the two individuals involved in the Incident were, in fact, Postal Service employees rather than independent contractors.
[4] The Postal Service objects to Carlson's disclosure of information about the parties' settlement discussions, which are confidential under ADR local Rule 7-4. *See* Postal Service Opposition, Docket No. 43, at 15. At oral argument, however, the Postal Service stipulated that it does not object to the disclosure of the fact that Snyder and Watson discussed Carlson's request at the settlement conference but did not disclose the identities of the individuals involved in the Incident.

Declaration of Sheela A. Portonovo ("Portonovo Motion Decl."), Ex. A ("First FOIA Request"). Carlson stated in his letter that Postal Service attorneys Sara Snyder and Jeremy Watson knew the identities of the individuals involved in the Incident and therefore, that the Postal Service should contact these individuals for further information to start the search for records. *Id.*[5]

On January 24, 2015, Carlson submitted a request for assistances to the Postal Regulatory Commission ("PRC"). Carlson Motion Decl. ¶ 22. According to Carlson, "the PRC declined to assist and instead forwarded [his] request to the Postal Service's Office of the Inspector General (OIG)." *Id.* According to Carlson, he "did not receive any further response from the Postal Service, the PRC, or the OIG" and that he learned through a FOIA request that the OIG "forwarded [his] inquiry to Kim Wu, the manager of Consumer and Industry Affairs for the Postal Service's San Francisco District." *Id.* Mr. Wu did not respond to his inquiry. *Id.*

Carlson submitted another FOIA request to the Postal Service on May 4, 2015 ("Second FOIA Request"). Portonovo Motion Decl. ¶ 4 & Ex. B. In this request, Carlson asked for "all records, including e-mail messages, that employees in, or supporting, a FOIA Requester Service Center created or received relating to [his First FOIA Request] . . . ." *Id.* In addition, between July 20, 2015 and May 7, 2016, Carlson submitted six additional FOIA requests seeking information that would help him to uncover the identities of the individuals involved in the Incident. Castorina Motion Decl. ¶ 7 & Exs. B-G.

Carlson states in his declaration that on December 2, 2016, he called the Postal Service's 800-ASK-USPS customer service line "to inquire about the procedure to complain about a postal employee." *Id.* ¶ 24. He "determined that the Postal Service asks a customer for the name of the employee" when a complaint is taken. *Id.* According to Carlson, the "representative told [him] that customers have a right to ask employees for their name and, also, employees should be wearing identification." *Id.* Carlson also has submitted a copy of the form used by customer service agents who take calls on the 800-ASK-UPS line, which he obtained through a separate FOIA request, showing that there is a space for the name of the employee who is the subject of the

United States District Court
Northern District of California

---

[5] At oral argument, the Postal Service confirmed that Snyder and Watson knew the identities of the individuals involved at this point.

complaint. Carlson Opposition Decl. ¶ 6 & Appendix 3.

The Postal Service, in turn, offers evidence that complaints will be accepted by Postal Service customer service agents even if a customer does not know the name of the employee whose conduct is the basis of the complaint. *See* Declaration of Debbie Judy ("Judy Opposition Decl.") ¶ 4. It also contends that these agents are not qualified to opine on whether an employee is obligated to provide his or her name in response to a customer's request and therefore, that any opinions expressed on this subject by customer service agents to Carlson should be disregarded. *Id.* ¶ 5.

### D. The Postal Service's Internal Investigation of the Santa Cruz Incident and Efforts to Respond to the FOIA Requests

In the meantime, evidence submitted by the Postal Service in connection with the Motions reflects that when Cormier received the January 14, 2015 email from Carlson asking her to investigate the Incident, she forwarded it to Postal Service attorneys Sheela A. Portonovo, Sara K. Snyder, Jeremy M. Watson, and Matthew J. Connolly. Cormier Motion Decl. ¶ 3 & Ex. A. According to Portonovo, attorneys Snyder and Watson "informally investigated the incident and copied [Portonovo] on emails describing the results of their investigation." Portonovo Motion Decl. ¶ 5.

Snyder states in her declaration that she "inquired with certain individuals who were considered likely to have information about this incident, either because of their direct involvement in the incident or because, by virtue of their positions, [they] may have received information about the incident in the ordinary course of business." Declaration of Sara Snyder, Docket No. 40-7 ("Snyder Motion Decl.") ¶ 6. The Court presumes that a reasonable investigation would have included the officer-in charge of the Santa Cruz post office, Jae An, though the Postal Service has not confirmed or denied that he was contacted by Snyder or Watson. The Postal Service did stipulate at oral argument, however, that Snyder and Watson learned the identities of the two Postal Service employees involved in the Incident within a day or two of initiating their investigation and talked to them about the Incident. Based on those conversations, they determined that the individual who photographed Carlson did not use a phone issued by the

1    Postal Service to take or store the photograph, or to send or receive any text messages containing

2    or related to the photograph.  *Id*. ¶ 7.  They also concluded that the photograph was not transmitted

3    through the Postal Service's email network.  *Id*.

4           On February 25, 2015, Postal Service attorney Portonovo began a search for records that

5    were responsive to the First FOIA Request.  Portonovo Decl. ¶ 7.  Having concluded that "any

6    responsive records pertaining to the incident were likely to have been generated during the course

7    of the informal investigation and memorialized in email messages," she contacted the Postal

8    Service's Information Catalog Program (ICP), which conducts searches of the Postal Service's

9    email archives in connection with FOIA requests.  *Id*. ¶ 6-7.  She instructed ICP to run a search

10   using search terms "Carlson," "Santa Cruz," "Photograph," Picture," or "Photo."  *Id*. ¶ 7.  On

11   March 2, 2015, ICP reported to Portonovo that this search had turned up 31,208 potentially

12   responsive documents and that the search had been completed.  *Id*.

13          Concluding that the search was too broadly framed, Portonovo obtained from Snyder a list

14   of individuals who might have responsive records, consisting of Snyder, Watson, and eight

15   individuals Snyder and Watson had interviewed when they conducted the informal investigation.

16   *Id*. ¶ 8.  Portonovo called each person on this list to ask whether any of them had records, in any

17   format, identifying the individual who photographed Mr. Carlson.  *Id*.  According to Portonovo,

18   all of them told her that if they had any responsive documents they would be in the form of email

19   communications.  *Id*.  Portonovo therefore asked ICP to conduct another search on March 5, 2015,

20   using the same search terms but limiting the search to emails that had been sent or received by the

21   ten individuals on the list.  *Id*.

22          On March 6, 2015, ICP sent Portonovo the results of this search: 149 potentially

23   responsive emails sent by the individuals on the list and 305 emails received by them.  *Id*. ¶ 9. At

24   this point, Portonovo states, she re-read the First FOIA Request and realized that it focused on the

25   identity of the photographer.  *Id*.  Consequently, she sent a third request to ICP on March 25, 2015

26   asking it to add the name of the photographer among the search terms.  *Id*.  This search turned up

27   34 potentially responsive emails sent by the employees on the list, and 58 potentially responsive

28   emails received by those employees.  *Id*.  Portonovo requested that IPC retrieve these records, but

neither she nor anyone else at the Postal Service reviewed the documents or responded to Carlson's First FOIA Request in 2015. *Id*. Portonovo states that "[u]nfortunately, due to competing priorities and limited resources, review of the emails was delayed." *Id*.

On December 24, 2015, Carlson filed the Complaint in this case. Shortly thereafter, in January 2016, the Postal Service resumed its efforts to find responsive records. *Id*. ¶ 10. Because the better part of a year had passed since the previous search had been performed, Portonovo sent another request to ICP, using essentially the same search terms as she used in her last search except that: 1) she added her own name and the names of eight other attorneys who "were informed about the incident"; and 2) she entered the first and last name of the photographer as separate search terms. *Id*. Again, Portonovo confirmed with the individuals who were added to the list that any responsive records would be in the form of emails. *Id*. The search yielded more than 1,893 records. Portonovo states that she reviewed all of these documents manually to determine which ones were responsive. *Id*.

With respect to the Second FOIA Request, which sought records about the First FOIA Request, Portonovo reasoned that all responsive records would be found on her own workstation because she had conducted the search for documents responsive to the First FOIA Request. *Id*. ¶ 11. Accordingly, she conducted a search of the emails stored on her own computer for the Second FOIA Request. *Id*.

All in all, Portonovo identified 58 pages of records she found to be responsive to the First FOIA Request and 102 pages of records responsive to the Second FOIA Request. *Id*. ¶ 12. The Postal Service turned over to Carlson, in whole or in part, 57 of the 58 pages that were responsive to the First FOIA Request with a March 31, 2016 response letter. Portonovo Motion Decl., Ex. C ("First FOIA Request Response Letter"). In that letter, the Postal Service explained that it had withheld information pursuant to FOIA Exemptions 5 and 6. *Id.*

The Postal Service released, in whole or in part, all of the 102 pages that were responsive to the Second FOIA Request with a separate response letter, also dated March 31, 2016. *Id*., Ex. D ("Second FOIA Request Response Letter"). In that response letter, the Postal Service explained that it had withheld information pursuant to FOIA Exemptions 3, 5, and 6.

Where the Postal Service produced a document with redactions, it made notations on the document stating the FOIA exemption it claimed justified the redaction. *See* Cormier Motion Decl. ¶ 5; Second Declaration of Douglas F. Carlson ("Carlson Opposition Decl."), Appendix 1 & 2 (reflecting notations made by Postal Service showing claimed exemptions). According to Cormier, at some point it was determined by the Postal Service that the notations were incomplete and therefore, on December 16, 2016, Cormier emailed a revised version of the responsive documents with more complete notations. Cormier Motion Decl. ¶ 5. She states that the exemptions claimed remained the same as those noted in the March 31, 2016 response letters. *Id.*

### E. The Sutanto Letter

In support of its Opposition to Carlson's motion for summary judgment, the Postal Service offers the declaration of Ferdinand Sutanto. Declaration of Ferdinand Sutanto, Docket No. 43-6 ("Sutanto Decl.") ¶ 2. Sutanto, who is currently a General Analyst with the Postal Inspection Service, states that he served "for a short period of time in March 2015" "in an acting capacity as the Consumer and Industry Contact Manager for the Bay Valley District." *Id.* In that capacity, he states, he was "responsible for overseeing the process of responding to customer complaints and inquiries in the Postal Service's Bay Valley District." *Id.* ¶ 3.

According to Sutanto, on March 9, 2015, he responded by letter to an inquiry by Carlson addressed to the Postal Regulatory Commission that was forwarded to Sutanto's "office."[6] *Id.* In the letter, Sutanto stated that he was responding to Carlson's inquiry regarding "service and unprofessional personnel at the East Santa Cruz Post Office on January 11, 2015." Sutanto Decl., Ex. A ("Sutanto Letter"). Sutanto stated that he wanted to "personally apologize on behalf of the Postal Service" and further stated, "[w]e regret this experience, which does not reflect our high standards of service." *Id.* He went on to state that Carlson's "concerns were brought to the attention of the Santa Cruz Officer-in-Charge, Jae An, who oversees the East Santa Cruz Station, for further research and corrective action." *Id.* According to Sutanto, "Mr. An could not identify

---

[6] As noted above, Carlson states in a declaration that on January 24, 2015, he submitted a request for assistances to the Postal Regulatory Commission ("PRC"). Carlson Motion Decl. ¶ 22. Presumably, the request that was forwarded to Sutanto was the request Carlson sent on January 24, 2015.

the personnel [Carlson] implied in [his] letter" and "request[ed] more descriptive information on the female individual you had the encounter with to assist with identifying and addressing the behavior."[7] *Id*. Sutanto also stated that the "personnel at the East Santa Cruz Post Office were reminded to be courteous and professional whenever interacting with the public" and that he was "confident that the actions taken by Management at the East Santa Cruz [Post Office] should eliminate any issues regarding service and employee behavior." *Id*. At the end of the letter, below Sutanto's signature, two reference numbers were listed: 1) OIG 150209HER065; and 2) CA121622603. *Id*. The first number matches a "Hotline Case Number" referenced in a document produced to Carlson by the Postal Service (with redactions), specifically, an email from Jeremy Watson to Sheela Portonovo dated February 11, 2015. Carlson Opposition Decl., Appendix 2.

Carlson states in a declaration filed in support of his Reply brief that he did not receive the Sutanto Letter, which he saw for the first time when it was filed as an exhibit in this case. Third Declaration of Douglas F. Carlson, Docket No. 53 ("Carlson Reply Decl.") ¶ 1. The Postal Service does not dispute that this letter was not included in its FOIA responses.

## F. The *Vaughn* Index

In support of its summary judgment motion, the Postal Service provided a *Vaughn* index. *See* Castorina Motion Decl., Ex. A. A *Vaughn* index is supposed to identify each responsive document that is withheld, list the statutory exemption(s) claimed, and provide a particularized explanation of how disclosure of the particular document would damage the interest protected by the claimed exemption. *Wiener v. F.B.I.*, 943 F.2d 972, 977 (9th Cir. 1991). In general, courts require government agencies in FOIA cases to provide such an index where documents (or portions of documents) are withheld in order to address the "lack of knowledge by the party seeking disclosure," which "'seriously distorts the traditional adversary nature of our legal system[ ].'" *Wiener v. F.B.I.*, 943 F.2d 972, 977 (9th Cir. 1991) (quoting *Vaughn v. Rosen*, 484 F.2d 820, 823-25 (D.C. Cir. 1973)). The Ninth Circuit has held, however, that where "a FOIA

---

[7] As noted above, it is undisputed that at this point, Postal Service attorneys Watson and Snyder were already aware of the identities of the individuals involved, having conducted an internal investigation that likely would have included Mr. An.

11

1    requester has sufficient information to present a full legal argument, there is no need for a *Vaughn*

2    index." *Minier v. Central Intelligence Agency*, 88 F.3d 796, 804 (9th Cir. 1996) (citing *Wiener*,

3    943 F.2d at 978 n. 5).

4        Where a *Vaughn* index is required, "[s]pecificity is the defining requirement." *Wiener*, 943

5    F.2d at 979 (internal quotation and citation omitted). Boilerplate explanations of the exemptions

6    claimed that are not tailored to specific documents or redactions are not sufficient. *Id*. at 978-979.

7    Likewise, claiming several exemptions without identify the specific withheld content to which

8    each claimed exemption applies is not adequate unless *each* of the exemptions is applicable to all

9    of the withheld content identified. *Id*. at 979. Further, while courts may conduct an *in camera*

10   review of documents withheld under the various FOIA exemptions to resolve FOIA cases, the

11   Ninth Circuit has cautioned that such a review is not appropriate unless it is not possible to resolve

12   the disputed issues through the provision of a more detailed *Vaughn* index. *Id*.

13       The *Vaughn* index submitted in this case consists of 29 separate entries identified as

14   documents 1-1 to 1-29 (the documents that are responsive to the First FOIA Request) and another

15   26 entries identified as documents 2-1 to 2-26 (the documents that are responsive to the Second

16   FOIA Request).[8] As to the documents that were produced with redactions, the exemptions

17   claimed for specific content are also identified in notations on the documents themselves next to

18   the redactions. *See* Douglas Opposition Decl., Appendix 2 (sample documents produced by the

19   Postal Service in response to Carlson's FOIA requests). The exemptions claimed in the *Vaughn*

20   index are described in the accompanying declaration of Janine Castorina, who is the Chief Privacy

21   and Records Management Officer for the United States Postal Service. Castorina Motion Decl. ¶

22   2.

23       Castorina states that the Postal Service found 161 pages of emails and attachments that

24   were responsive to Carlson's FOIA requests. *Id.* ¶ 5. With respect to the FOIA Exemption 5

25   redactions, she states that they are based on attorney-client privilege, the attorney work product

26   privilege, and the deliberative process privilege. *Id.* ¶ 9. In connection with this exemption, she

27   _____

28   [8] At oral argument, the Postal Service confirmed that no documents were withheld in their entirety.

states generally in her declaration that "[a]fter learning of Plaintiff's informal complaint, Deputy Managing Counsel Sara Snyder, Attorney Jeremy Watson, Attorney Sheela Portonovo, and then-Chief Privacy Officer Matthew Connolly began an investigation into the matter in anticipation of future litigation." *Id*. ¶ 8. She further states that "[t]he emails responsive to Plaintiff's FOIA requests were all generated following Plaintiff's informal complaint as part of the investigation into the informal complaint and as part of the efforts to respond to Plaintiff's FOIA requests." *Id*.

Castorina describes the information redacted under Exemption 5 as falling into four categories:

> (1) facts divulged by Postal Service employees to Postal Service attorneys, (2) communications from Postal Service attorneys to Postal Service employees seeking information, providing instruction, or giving opinions about the matter, (3) communications among Postal Service attorneys analyzing and discussing client-shared information, and (4) information identifying higher ranking Postal Service Law Department personnel.

*Id*. ¶ 10. She contends the first three categories fall with "the most basic definitions attorney-client and attorney work-product privileges" because "[t]hese intra-agency communications between and among attorneys and Postal Service employees in the course of an investigation of a customer complaint of intimidation were made in anticipation of litigation, especially because the Postal Service was already engaged in litigation with Plaintiff at the time." *Id*. ¶ 11. She further states that the information in the fourth category is subject to attorney-client privilege and attorney work-product protection because "disclosure of the names and titles of these individuals would reveal and subject to scrutiny the preparations, escalation, and decisions of the attorneys who were investigating Plaintiffs complaint." *Id*. ¶ 12. In addition, she states, "this information is protected by the deliberative process privilege, as the information reveals part of the Postal Service's decision making process by identifying the individuals who were involved and the extent to which the matter was escalated within the Postal Service." *Id*.

Castorina states that the "information withheld by the Postal Service under Exemption 6 in the 161 pages of documents provided to Plaintiff includes the names, titles, and personal contact information of Postal Service employees that appear in the emails and spreadsheets responsive to Plaintiff's FOIA requests." *Id*. ¶ 14. According to Castorina, this information is "not made

13

publicly available by the Postal Service." *Id.* ¶ 15.  She further states that "[t]he employees whose information was withheld are not retail employees and do not typically have interaction with the public." *Id.*  Castorina states that she is "not aware of any public interest in the names, titles, and contact information the Postal Service has withheld under Exemption 6" and that "[t]his information alone in no way sheds light on the Postal Service's performance of its statutory duties." *Id.* ¶ 16.

### G.  The Complaint

Carlson commenced this action on December 24, 2015, asserting three claims based on three separate FOIA requests.  In his first and second claims ("Claim One" and "Claim Two"), Carlson alleged that he had submitted FOIA requests on January 21, 2015 and May 4, 2015 (the First and Second FOIA Requests), that he had timely mailed administrative appeals as to each of these requests, and that the Postal Service had produced no records in response to these requests, in violation of FOIA.   Carlson's third claim ("Claim Three") is based on a FOIA request that pre-dates the Incident, made on July 29, 2014 ("the Third FOIA Request").  *See* Complaint ¶ 14 and July 29, 2014 request, attached thereto.  The Complaint alleges that the Postal Service "improperly withheld records that Plaintiff requested" in response to his Third FOIA Request.  *See* Complaint ¶ 18.  The parties stipulated in their March 24, 2016 Case Management Statement that "[o]n February 26, 2016, the Postal Service sent a complete response to the third request. Plaintiff and the Postal Service agree that no further issues remain regarding plaintiff's third claim."  Therefore the Court dismisses Claim Three on the basis that it is moot. [9] Docket No. 13 at 2.

## III.   ANALYSIS

### A.   Legal Standard

#### 1.  Overview of FOIA

FOIA "was enacted to facilitate public access to Government documents."  *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009) (internal quotation marks omitted).

---

[9] At oral argument, Carlson stipulated to the dismissal of Claim Three on the basis of mootness but preserved his argument that he should be considered the prevailing party as to that claim.  As discussed below, the Court agrees.

Congress's intention in enacting FOIA was to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed.'" *Id.* (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (internal quotation marks omitted)). Thus, FOIA "provides public access to official information 'shielded unnecessarily' from public view and establishes a 'judicially enforceable public right to secure such information from possibly unwilling official hands.'" *Id.* (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).

Under FOIA, "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). There is a strong presumption in favor of disclosure. *See U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). Congress also recognized, however, that government agencies can have legitimate reasons for withholding information from the public. *Id.* Hence, FOIA "requires federal agencies to make Government records available to the public, subject to nine exemptions for specific categories of material." *Milner v. Dep't of the Navy*, 562 U.S. 562, 564 (2011). The nine exemptions are "explicitly made exclusive and must be narrowly construed." *Id.* at 565.

A FOIA requester who is dissatisfied with the response of a government agency may bring an action in federal district court asking the court to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). Section 552(a)(4)(B) further provides that "[i]n such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section [listing FOIA exemptions], and the burden is on the agency to sustain its action." *Id.*; *see also Light v. Dep't of Justice*, 968 F. Supp. 2d 11, 23 (D.D.C. 2013) (to prevail in a FOIA action, the agency "must show that its search for responsive records was adequate, that any claimed exemptions actually apply, and that any reasonably segregable, non-exempt parts of records have been disclosed after redaction of exempt

information"). "Affidavits submitted by an agency to demonstrate the adequacy of its response are presumed to be in good faith." *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 770 (9th Cir. 2015). This presumption may be overcome, however, where the court finds that the requester has made a "meaningful evidentiary showing" of government misconduct. *Id*. at 772 (citing *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 175 (2004)).

### 2. Rule 56

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Court may grant summary judgment where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. If the moving party meets that burden, the party opposing summary judgment must establish that there are "specific facts showing that there is a genuine issue for trial." *Id.* In this context, the Court draws all reasonable factual inferences in favor of the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

FOIA cases are often decided on motions for summary judgment because the facts are rarely in dispute. *See Minier v. Cent. Intelligence Agency*, 88 F.3d 796, 800 (9th Cir. 1996). While courts have discretion to permit discovery in FOIA cases, discovery in such cases is limited "because the underlying case revolves around the propriety of revealing certain documents." *Lane v. Dep't of Interior*, 523 F.3d 1128, 1134 (9th Cir. 2008). Consequently, "courts routinely delay discovery until after summary judgment in [FOIA cases] . . . and [the Ninth Circuit] has affirmed denials of discovery where . . . the plaintiff's requests consisted of 'precisely what defendants maintain is exempt from disclosure to plaintiff pursuant to the FOIA.'" *Id*. at 1134–35 (quoting *Pollard v. FBI*, 705 F.2d 1151, 1154 (9th Cir.1983) and citing *Miscavige v. I.R.S.*, 2 F.3d 366, 369 (11th Cir. 1993); *Nolan v. U.S. Dep't of Justice*, 973 F.2d 843, 848 (10th Cir. 1992); *Simmons v. U.S. Dep't of Justice*, 796 F.2d 709, 711-712 (4th Cir. 1986)). As the court in *Simmons* explained, "[a]ttempting to alleviate this problem, Congress provided in the FOIA that courts should make a de novo review of any claimed exemption by an agency, . . . review documents in camera  if

necessary, . . . and release any reasonably segregable non-exempt portion of a document that an agency claims is exempt." 796 F.2d at 710-711 (citing 5 U.S.C. § 552(b)). In addition, courts "have added to these safeguards by requiring agencies to submit affidavits, along with redacted documents, which explain claimed exemptions." *Id.* at 711; *see also Pac. Fisheries, Inc. v. United States*, 539 F.3d 1143, 1150 (9th Cir. 2008) (remanding action to district court to make factual findings relating to exemptions and instructing that "[i]n order to assist the district court, the [government agency] should submit affidavits describing in more detail the withheld portions of these documents so that both the district court and [the FOIA requester] can evaluate the government's claims of exemption.").

Although most FOIA cases can be decided on summary judgment, the Ninth Circuit has recognized that "some FOIA cases require resolution of disputed facts." *Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987, 989 (9th Cir. 2016) (citing *GC Micro Corp. v. Def. Logistics Agency*, 33 F.3d 1109, 1110 (9th Cir. 1994) as an example of a case in which the applicability of FOIA exemption required "a factual determination of substantial competitive harm"). "[I]if there are genuine issues of material fact in a FOIA case, the district court should proceed to a bench trial or adversary hearing." *Id.* at 990. The Ninth Circuit has made clear that even in FOIA cases, "[r]esolution of factual disputes should be through the usual crucible of bench trial or hearing, with evidence subject to scrutiny and witnesses subject to cross-examination." *Id.* Following such a bench trial, the district court issues findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure. *Id.*

**B. Sufficiency of the Records Search**

In his summary judgment motion, Carlson stated that he "generally is not challenging the scope of the [Postal Service] searches" but that "one key record generated during the FOIA search for records, a report of the search of email records, including search terms, appears only in an email message from a computer technician to defendant's attorney." Plaintiff's Motion at 22. According to Carlson, "records of the search should exist independently, aside from in an email message to an attorney." *Id.* In this respect, he argued that "Defendants cannot search only one record system if others are likely to produce responsive records." *Id.* (citing *Ogelsby v. U.S. Dep't*

*of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).

At oral argument, Carlson agreed to drop this challenge, stipulating that he does not challenge the adequacy of the Postal Service's search. Therefore, the Court need not reach this argument.

## C. Exemption 5

### 1. Background

The Postal Service contends that "the vast majority of the information [it has] withheld falls under Exemption 5." Postal Service Motion at 9. Exemption 5 provides that FOIA "does not apply to . . . inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency . . . ." 5 U.S.C. § 552(b)(5). Exemption 5 "entitles an agency to withhold from the public 'documents which a private party could not discover in litigation with the agency'" and thus "covers the attorney-client privilege, the attorney work-product privilege, and the executive 'deliberative process' privilege." *Maricopa Audubon Soc. v. U.S. Forest* Serv., 108 F.3d 1089, 1092 (9th Cir. 1997) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148 (1975)) and citing *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 862 (D.C.Cir.1980)). The Postal Service invokes Exemption 5 under all three doctrines in this case, arguing that most of the responsive documents "would not have existed but for Plaintiff's initial inquiry to the Postal Service's attorney about the Santa Cruz Incident" in his January 14, 2015 email to Cormier prior to the settlement conference that was set to occur two days later in a separate FOIA case. Postal Service Motion at 9.

First, the Postal Service contends that categories one through three of documents described in the Castorina Motion Declaration "fall[] squarely within the work product doctrine." *Id.* at 10; *see also* Castorina Motion Decl. ¶ 10. These categories are: "(1) facts divulged by Postal Service employees to Postal Service attorneys, (2) communications from Postal Service attorneys to Postal Service employees seeking information, providing instruction, or giving opinions about the matter, [and] (3) communications among Postal Service attorneys analyzing and discussing client-shared information. Castorina Motion Decl. ¶ 10. According to the Postal Service, "[t]he information obtained in categories 1, 2, and 3 deal with questions posed by attorneys, statements given by

18

1  employees, mental impressions, legal strategy, and conclusions based on what was obtained from

2  the informal investigation." *Id*.[10]

3      The Postal Service further contends that all of these documents were generated in

4  anticipation of litigation even though Carlson "did not claim he would file a lawsuit" in his

5  January 14, 2015 email to Cormier. *Id.* at 11.   In particular, the Postal Service contends it

6  generated these documents in anticipation of litigation because: 1) they were created in response to

7  an inquiry Carlson made in connection with pending litigation in a separate FOIA case; and 2)

8  Carlson had filed FOIA lawsuits against the Postal Service in the past. *Id*. at 11.   Therefore, the

9  Postal Service contends, the documents that fall within categories one through three described in

10  the Castorina Motion Declaration are protected as work product.

11      Next, the Postal Services argues that "[w]hile virtually all of the withheld documents are

12  work product, many are also attorney-client communications." *Id*. at 12.   In particular, the Postal

13  Service represents that "[t]he redacted Count 1 emails include discussions between Postal

14  attorneys and the Postal employees involved in or knowledgeable about the Santa Cruz Incident."

15  *Id*. (citing Castorina Motion Decl. ¶¶ 4, 5, 8-12 and Ex. A). According to the Postal Service, these

16  records were part of the investigation of the Santa Cruz Incident conducted by the Postal Service's

17  attorneys  and the information contained in them has been kept confidential.  *Id*. (citing Portonovo

18  Motion Decl. ¶ 5;  Connolly Motion Decl. ¶ 10).   Therefore, the documents are protected by

19  attorney-client privilege, the Postal Service asserts.  *Id*.

20      In addition, the Postal Service claims that "many of the Count 2 documents were emails

21  dealing with the search for the documents requested by Plaintiff" and these records contain advice

22  by Postal Service attorneys "for how to narrow the search and find the documents responsive to

23  the request." *Id*. (citing Portonovo Motion Decl. ¶¶ 6-12; Castorina Motion Decl. Ex. A). This

24  advice "included the names of people who were most likely to receive emails related to the Santa

25  Cruz Incident." *Id*. (citing Portonovo Motion Decl. ¶¶ 8-10).  These documents also fall within

26  the attorney-client privilege, the Postal Service argues.  *Id*.

27  _____

28  [10] As noted above, the fourth category is "information identifying higher ranking Postal Service
Law Department personnel."  Castorina Motion Decl. ¶ 10.

19

Finally, the Postal Service invokes the deliberative process privilege, stating that it "made some redactions that reflected the level to which the Plaintiff's informal complaint was escalated within the law department." *Id.* at 13 (citing Castorina Decl. ¶¶ 4, 10, and 12 & Ex. A and citing as examples documents 1-5 and 1-6).[11] According to the Postal Service, "[r]evealing this information would discourage candid communication within the law department, weakening the Postal Service's ability to address similar problems in the future." *Id.*

Carlson challenges the Postal Services Exemption 5 claims on numerous grounds. First, Carlson argues that Exemption 5 covers only documents that are "normally" privileged in civil litigation and that all three doctrines invoked by the Postal Service are limited by the obligation to produce the names of witnesses and individuals likely to have discoverable information under Rule 26(a)(1)(A)(i) and Rule 26(a)(3)(A)(i) of the Federal Rules of Civil Procedure. Carlson Opposition at 1-2 (citing *N. L. R. B. v. Sears, Roebuck & Co*., 421 U.S. 132, 149 (1975); *F.T.C. v. Grolier Inc.*, 462 U.S. 19, 27 (1983)). Moreover, he asserts, FOIA itself expressly limits Exemption 5 to documents that can be withheld "by law" and requires that segregable information must be produced. *Id.* at 3 (citing 5 U.S.C. § 552(b)("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection"); *Envtl. Prot. Agency v. Mink*, 410 U.S. 73, 91 (1973)

---

[11] The parties have not provided the Court with copies of documents 1-5 and 1-6. The *Vaughn* index describes document 1-5 as an email from attorney Sara Snyder to attorney Daren Draves dated January 23, 2015, subject/title withheld. The "Description of Withheld Information" for the document states: "This document is an email from attorney Sara Snyder to Managing Counsel Daren Draves providing a summary and status update between attorneys regarding the investigation being conducted by the law department into Plaintiff's complaint related to his picture being taken by Postal Service employees. The summary details information gained during the investigation from attorney interviews of employees and legal analysis of potential future litigation. Portions are withheld pursuant to attorney-client privilege, the attorney work product doctrine, and to protect the privacy of individuals named in the email who witnessed and were involved in the incident. Names of law department staff are withheld as they demonstrate how the matter was escalated and deliberated upon." Document 1-6 is described as an "email chain" between Draves and Snyder, subject/title withheld, dated January 23, 2015. The "Description of Withheld Information" for the document states: "This document is an email from Managing Counsel Daren Draves responding to email l-5 above from Attorney Sara Snyder. Portions are withheld pursuant to attorney-client privilege, the attorney work product doctrine, and to protect the privacy of individuals named in the email who witnessed and were involved in the incident. Names of law department staff are withheld as they demonstrate how the matter was escalated and deliberated upon." Castorina Motion Decl., Ex. A.

1    ("Exemption 5 contemplates that the public's access to internal memoranda will be governed by

2    the same flexible, common-sense approach that has long governed private parties' discovery of

3    such documents involved in litigation with Government agencies" and that approach "extend[s] to

4    the discovery of purely factual material appearing in those documents in a form that is severable

5    without compromising the private remainder of the documents.").  Therefore, Carlson asserts, the

6    names of the eight employees who were involved in the Incident or who were consulted about it

7    and whose names were included in the Postal Service's search terms *would be* discoverable in

8    civil litigation, putting this information outside of the ambit of Exemption 5.  *Id.*

9        Second, Carlson argues that work product protection does not extend to documents

10   prepared in the ordinary course of business that were not created *because of* litigation and would

11   have been created in essentially the same form regardless of the litigation.  *Id.* at 3-4 (citing *U.S. v.*

12   *Textron Inc. and Subsidiaries*, 577 F.3d 21, 30 (1st Cir. 2009); *U.S. v. Richey*, 632 F.3d 559, 568

13   (9th Cir. 2011)).  Carlson concedes that any documents that were created before the January 16,

14   2015 settlement conference in response to his email inquiry to Cormier likely were created

15   because of that litigation (though he does not concede that the names contained in these

16   documents fall within the work-product doctrine for the reasons discussed above).  *Id.*  He also

17   seems to concede that documents created prior to his January 21, 2015 FOIA request (the First

18   FOIA Request) were created because of that litigation and were not prepared in the ordinary

19   course of business.  As of January 21, 2015, however, he contends there is a fact question as to

20   whether the redactions the Postal Service claims fall under Exemption 5 were created in the

21   ordinary business.  *Id.*

22       One particular category of documents that Carlson contends falls within the ordinary

23   course of business exception to work product protection is the documents that reflect the Postal

24   Service's search for email records that are responsive to Carlson's FOIA requests, consisting of 43

25   pages of records, identified in the *Vaughn* index as documents 2-10 to 2-15, 2-19, 2-21 and  2-22.

26   *Id.* at 5-7.  All of these emails were between Sheela Portonovo and Ashley Tyeryar, at ICP.

27   Castorina Motion Decl., Ex. A. Carlson contends the exclusive subject of these emails, dated from

28   March 5, 2015 to March 26, 2015,  is "the search for records responsive to [the First FOIA

Request], including search terms and the number of responsive records." *Id.* In support of this contention, he points out that "the subject line of many of the records includes a number roughly corresponding to the FOIA request tracking number that defendant assigned to plaintiff's FOIA request" and "the subject line for documents 2-13 and 2-19 reads 'RE: New terms. RE: FOIA Request from Douglas Carlson, 2015-FPFD-0024.'" *Id.* According to Carlson, "[a] search for records is the most fundamental step in processing a FOIA request" and the search for records that was conducted by Ms. Portonovo could have been performed by a staff member rather than an attorney. *Id.* Moreover, he asserts, these documents were created in order to respond to his FOIA request, not because of litigation, even if the Postal Service was anticipating litigation at that time. *Id.* at 5-6.[12]

As further support for his argument that these documents were created in the ordinary course of business and not because of litigation, Carlson points out that these emails were sent in March 2015. *Id.* at 7. According to Carlson, the results of the informal investigation that had been conducted by Postal Service attorneys in response to his January 14, 2015 request for assistance were already being shared with other employees on January 28, 2015, and "all email discussions about it concluded by February 5, 2015." *Id.* Moreover, he says, Portonovo does not say in her declaration that she was involved in the investigation; rather, she says she was copied on emails by Snyder and Watson (who she says *did* conduct the investigation) and she assisted the Postal Service's defense by "coordinat[ing] and conduct[ing] the search for records responsive to Counts 1 and 2.'" *Id.* (citing Portonovo Motion Decl. ¶¶ 2, 5-6). Carlson also points out that the instant action was not filed until December 24, 2015 and therefore, that Portonovo's statement that her efforts to search for records (conducted in March 2015) "assisted the Postal Service's legal defense in the above captioned matter" is incorrect. *Id.*

Carlson also argues that "[a]side from records relating to the FOIA search for records, some other records carry signs that they may not contain attorney work product." *Id.* at 8. In

---

[12] Carlson notes that when it first provided documents in response to his FOIA requests the notations next to the redactions on these documents did not list Exemption 5 as a basis for redaction. Carlson Opposition at 6.

particular, Carlson contends the unredacted content of Records 1-7, 1-35, 1-41 and 1-45 suggest that these records were related to the Postal Service's FOIA response rather than any anticipated litigation. *Id.*; *see also* Carlson Opposition Decl., Appendix 2 (copies of cited documents). Carlson also asserts that document 1-50 likely was not prepared because of any litigation but rather appears to relate to the OIG inquiry that was conducted after he submitted a complaint that was forwarded to OIG (discussed above). *Id.*

Carlson further contends the *Vaughn* index provided by the Postal Service does not provide a reliable basis for determining which documents and redactions might be covered by work product protection. *Id.* at 9-10. As a preliminary matter, Carlson asserts the *Vaughn* index is inadequate because it fails to distinguish between documents created in anticipation of litigations and those created in the ordinary course of business. *Id.* at 5. Even more troubling, he argues, is that the declaration that accompanies the *Vaughn* index, by Castorina, in which Castorina claims that both Sheela Portonovo and Mathew Connolly were involved in the investigation of the Santa Cruz Incident even though the declarations provided by Portonovo and Connolly indicate that they were not involved in the investigation, which was conducted by Snyder and Watson. *Id.* at 9 (citing Castorina Motion Decl. ¶ 8; Portonovo Motion Decl. ¶ 2; Connolly Motion Decl. ¶¶ 9-10). This mischaracterization suggests that Castorina is not trustworthy, Carlson asserts. *Id.*

Similarly, Carlson argues, Castorina's representation in the *Vaughn* index that records created in 2016, after he filed this action, were part of the informal investigation of the Incident are not credible as that investigation was long over; instead of stating that these documents were prepared in connection with this litigation, however, she simply used boilerplate language stating that the records were part of the investigation. *Id.* at 10. Carlson contends these deficiencies in the *Vaughn* index and the accompanying Castorina declaration render the Postal Service's claims unreliable and warrant *in camera* review of the withheld information by the Court. *Id.* at 10-12 (citing *Mervin v. F.T.C.*, 591 F.2d 821, 826 (D.C. Cir. 1978) (holding that *in camera* review "may be the only way to insure that exemption 5 is properly applied"); *Church of Scientology of California v. U.S. Dept. of Army*, 611 F.2d 738, 743 (9th Cir. 1979) ("[i]n camera inspection may supplement an otherwise sketchy set of affidavits"); *Quinon v. F.B.I.*, 86 F.3d 1222, 1228 (D.C.

Cir. 1996) ("in camera review may be particularly appropriate when either the agency affidavits are insufficiently detailed to permit meaningful review of exemption claims or there is evidence of bad faith on the part of the agency").

With respect to the Postal Service's reliance on attorney-client privilege, Carlson argues that the same 43 documents that he contends are not subject to work product protection, discussed above, also are not protected under the attorney-client privilege. *Id*. at 12-13. According to Carlson, the attorney-client privilege applies only to communications between a client and an attorney "for the purposes of obtaining legal advice." *Id*. at 13 (citing *Sandra T.E. v. South Berwyn School Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2009)). Carlson argues that as to these communications, however, there is neither legal advice nor a client. *Id*. The Postal Service's argument that Portonovo was somehow giving legal advice to Tyeryar "misrepresents the facts," Carlson asserts, "because the *attorney* wanted the search to be performed, while Ms. Tyeryar had no independent need to conduct a search for which she or anyone else needed legal advice." *Id*. Because the Postal Service has improperly invoked attorney-client privilege, Carlson contends, it would be appropriate for the Court to review the withheld and redacted records *in camera* to determine whether attorney-client privilege applies.

Finally, Carlson challenges the Postal Service's reliance on the deliberative process privilege to justify withholding the names of the higher level attorneys in the law department who were allegedly involved in the investigation of the Santa Cruz Incident. *Id*. at 14. Carlson calls "vague and dubious" the Postal Service's claim that disclosure of this information would reveal information about the "level to which the Plaintiff's informal complaint was escalated within the law department" and would "discourage candid communication within the law department." *Id*. (citing Postal Service Motion at 13). He further argues that the Postal Service has failed to provide authority for asserting the privilege in this context. *Id*. In fact, Carlson contends, courts have found that the identities of individuals involved in deliberations typically are not protected from disclosure by the deliberative process privilege, citing *Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 796 F. Supp. 2d 13, 29 (D.D.C. 2011). *Id*. In that case, according to Carlson, the court found that the privilege does not extend to the names of attendees at government meetings. *Id*.

Carlson argues that in this case, the Postal Service's attorneys "were effectively in meetings" and therefore, that their identities are not protected. *Id.*

In its Reply brief, the Postal Service rejects Plaintiff's argument that the names it has withheld are discoverable under Rule 26(a)(1)(A)(i) and 26 (a)(3)(A)(i), pointing out that discovery is the exception, not the rule in FOIA cases "'because the underlying case revolves around the propriety of revealing certain documents.'" Postal Service Reply at 2 (quoting *Lane v. Dep't of Interior*, 523 F.3d 1128, 1134 (9th Cir. 2008)). The Postal Service also rejects Carlson's assertion that there is a fact question as to whether documents created after January 21, 2015 (when Carlson submitted his First FOIA Request) are protected under the attorney work-product doctrine. *Id.* at 3-7. First, it argues that it reasonably anticipated litigation throughout 2015, pointing to the fact that Carlson also attempted to add a FOIA claim related to the Santa Cruz Incident in the FOIA action before Judge Corley, which the Court did not permit. *Id.* at 4.

The Postal Service also rejects Carlson's assertion that some of the documents that were produced in response to the First FOIA Request (documents 1-1 through 1-29) are not covered by the work product doctrine.[13]  *Id.* According to the Postal Service, all of these documents focused on the investigation of the Incident and even those that mentioned the First FOIA Request did not discuss *responding* to the FOIA request. *Id.* at 4-5 (citing Second Supplemental Declaration of Claire T. Cormier and Request for Judicial Notice) ("Cormier Reply Decl.") ¶ 4).[14] With respect to the documents responsive to the Second FOIA Request (documents 2-1 through 2-26), the Postal Service represents that the only redactions (other than the encryption passwords that Carlson does

---

[13] As noted above, Carlson specifically pointed to Records 1-7, 1-35, 1-41 and 1-45 and 1-50 as examples of documents that did not appear to have been created in anticipation of litigation. *See* Carlson Opposition at 8.

[14] The Postal Service requests that the Court take judicial notice of the "information filed in this case as well as in Plaintiff's previous Freedom of Information Act lawsuit against the Postal Service, Case No. CV 13-6017 JSC, pursuant to Federal Rule of Evidence 201." Cormier Reply Decl. ¶ 3. Federal Rule of Evidence 201(b)(2) states that courts may take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." As a result, courts may properly take judicial notice of public records, though not the truth of facts asserted in those records, which may be subject to reasonable dispute. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)). Accordingly, the Court takes judicial notice of the pleadings in Case No. 13-cv-6017 JSC but does not take judicial notice of the specific facts contained therein.

1   not contest) are the "names and email addresses that originated in the investigation documented in

2   the Count One documents." Reply at 6 (citing Castorina Decl., Ex. A (Docs. 2-1, 2-3, 204, 2-10

3   through 2-15, 2-19, 2-21, and 2-22); Cormier Reply Decl. ¶ 5 & Ex. A (redacted version of

4   document 2-1).

5        Further, the Postal Service asserts, in light of the ongoing litigation in the 6017 Case, even

6   communications with individuals such as Ms. Israel, a non-attorney who typically handled FOIA

7   requests, were part of the investigation conducted by the Postal Service attorneys. *Id.*   In

8   addition, to the extent the records search that was conducted by Portonovo might ordinarily have

9   been conducted by a non-attorney, this does not turn her communications into business records

10  that are outside of the protection of the work product doctrine, the Postal Service asserts, because a

11  document need not be prepared for the *sole* purpose of litigation to fall under the work product

12  doctrine. *Id.* at 7 (citing *Competitive Enter. Inst. v. United States Envtl. Prot. Agency*, 2017 WL

13  521503, at *8 (D.D.C. Feb. 8, 2017)).

14       Moreover, the Postal Service argues, because these documents are protected as attorney

15  work product, the Postal Service is not required to segregate the names that it has redacted because

16  "'if a document is covered by the attorney work-product privilege, the government need not

17  segregate and disclose its factual contents.'" *Id.* (quoting *Pac. Fisheries, Inc. v. United States*, 539

18  F.3d 1143, 1148 (9th Cir. 2008) (holding that the work product privilege "shields both opinion and

19  factual work product from discovery").

20       The Postal Service also rejects Carlson's arguments that the *Vaughn* index is inadequate.

21  *Id.* at 7-9.  To the extent Carlson challenges the redactions in the documents responsive to the

22  Second FOIA Request on the basis that these documents are not part of the law department's

23  investigation of the Incident (as stated in the *Vaughn* index and the Castorina Motion Declaration),

24  the Postal Service says that this characterization of these documents is accurate. *Id.* at 7-8. In

25  particular, the only disputed redactions in these documents were the names and email addresses

26  turned up in the investigation. Postal Service Reply at 8.  According to the Postal Service, this

27  information was "part of the investigation" even if other content was not, and therefore this

28  information was properly redacted as work product.  Thus, for example, the Postal Service

concedes that "[t]he bulk of the communications to and from Ms. Portonovo about the search was not 'part of the law department's investigation' and thus was not redacted, but the names and email addresses – the only redacted information – came directly from the investigation." *Id*.

The Postal Service argues further that even if the search for responsive records might ordinarily have been conducted by a non-attorney, it is not clear that the communications that would have resulted would have taken a substantially similar form to those of Portonovo (a requirement of the exception to the work product doctrine for documents created in the ordinary course of business) because in the absence of the law department's investigation the search terms that would have been used might have been quite different. *Id*. at 8-9. The Postal Service argues also that the fact that the search for records was conducted by an attorney bolsters the conclusion that Portonovo's communications were created in anticipation of litigation even if they also were part of the Postal Service's effort to respond to Carlson's FOIA request. *Id*. at 9 (citing *In re Grand Jury Subpoena (Mark Torf)*, 357 F.3d 900, 907 (9th Cir. 2004)).

With respect to attorney-client privilege, the Postal Service rejects Carlson's argument that it does not apply to the records relating to the search for records responsive to his First FOIA Request, namely, the communications between Portonovo and Tyeryar, the ICP contractor, in March 2015. *Id*. at 9-10. The Postal Service states, "[t]he only information redacted from these communications (and other search-related communications between Ms. Portonovo and others) was names and email addresses derived from the previous work product investigation that included many attorney-client communications." *Id.* at 10. The Postal Service acknowledges that "much of the search-related communications did not encompass traditional legal advice" and therefore was not redacted, pointing out that only "very limited information" was redacted." Even if this information does not "fall within the specific parameters of the attorney-client communication privilege," the Postal Service asserts, it is still protected as attorney work product. *Id*.

With respect to the deliberative process privilege, the Postal Service in its Reply brief reiterates its argument that disclosure of the identities of senior level attorneys involved in the investigation of the Incident would be likely to chill deliberations and therefore falls under the

deliberative process privilege. *Id*. at 10. It further contends that "[i]f 'agency records are indeed deliberative, it is appropriate to apply Exemption 5 to the documents themselves, as well as to the names of their authors.'" *Id*. (quoting *Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C. Cir. 1980)). According to the Postal Service, "[h]ere, the documents that included the names withheld under deliberative process were part of the Postal Service's decision-making process regarding how to deal with Plaintiff's complaint, continuing litigation, and ensuing FOIA request, including 'legal analysis of potential future litigation.'" *Id.* (quoting Castorina Decl. Ex. A (Docs. 1-5, 1-6, 1-7, and 1-8)). Even if this information is not protected under the deliberative process privilege, however, it is protected as attorney work product, according to the Postal Service, and therefore "the redactions can be upheld without analyzing whether or not they meet the requirements of deliberative process . . . even if the Court determines that they do not." The Postal Service further notes that "FOIA redactions under deliberative process require a segregability analysis, but attorney work product redactions do not." *Id.*

### 2. Discussion

The crux of the parties' dispute relating to Exemption 5 is whether the names, titles and email addresses of certain individuals, all of whom are Postal Service employees, may be redacted from documents responsive to Carlson's First and Second FOIA Requests under the work product doctrine, attorney-client privilege or the deliberative process privilege. In addressing this question, the Court is mindful that "[a]lthough Congress clearly intended to refer the courts to discovery principles for the resolution of exemption five disputes, the situations are not identical, and the Supreme Court has recognized that discovery rules should be applied to FOIA cases only 'by way of rough analogies.'" *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977) (quoting *Envtl. Prot. Agency v. Mink*, 410 U.S. 73, 86 (1973)). For example, as the Court in *Mink* noted, "we do not know whether the Government is to be treated as though it were a prosecutor, a civil plaintiff, or a defendant." 410 U.S. at 86. "Nor does the Act, by its terms, permit inquiry into particularized needs of the individual seeking the information, although such an inquiry would ordinarily be made of a private litigant." *Id*.

The Court concludes that the names, titles and email addresses that have been redacted by

the Postal Service from the responsive documents it produced to Carlson are not protected from disclosure under the attorney-client privilege, the deliberative process privilege, or the work product doctrine.

### a. The Deliberative Process Privilege

The Postal Service claims that the names and email addresses of the senior attorneys who were involved in investigating the Santa Cruz Incident are protected from disclosure under the deliberative process privilege. The Court disagrees.

To qualify for protection under the deliberative process privilege, a document must be both (1) "predecisional," that is, "generated before to the adoption of agency's policy or decision" and (2) "deliberative," meaning that it contains opinions, recommendations or advice about agency policies. *FTC v. Warner Communications, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (citing *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C.Cir.1980)). In order to establish that withheld material is "predecisional," "the agency must identify a specific decision to which the document is predecisional." *Maricopa Audubon Soc. v. U.S. Forest Serv.*, 108 F.3d 1089, 1094 (9th Cir. 1997). In determining whether material is "deliberative," courts "focus on the effect of the materials' release – namely, whether disclosure of the materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Id*. (internal citations and quotations omitted).

Deliberative materials are not limited to opinions; factual material also may be deliberative when disclosure would "expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Judicial Watch, Inc. v. U.S. Dep't of Treasury*, 796 F. Supp. 2d 13, 28 (D.D.C. 2011). On the other hand, purely factual material that does not divulge the reasoning process with which a decision was made is not covered by the deliberative process unless it is so interwoven with the deliberative material that it is not feasible to sever the factual material from the deliberative material. *See Assembly of State of Cal. v. U.S. Dep't of Commerce*, 968 F.2d 916, 921 (9th Cir. 1992), as amended on denial of reh'g (Sept. 17, 1992). Thus, for example, in

*Judicial Watch*, the court found that the content of committee minutes was protected under the deliberative process privilege but that easily segregable minute headings that listed the date and time, the committee members present and the observers was not protected because it was purely factual and did not disclose any deliberative material. 796 F. Supp. 2d at 29-30.

Here, the Postal Service has not identified any specific decision or shown how the redacted information was predecisional. Instead, it has simply alleged generally that the information was relevant to the question of how the Postal Service should handle Carlson's FOIA requests and litigation. Further, it has offered no explanation in support of its conclusory statement that disclosure of the names of the senior attorneys who were involved in the investigation would somehow divulge the reasoning process of decisionmakers in such a way as to chill future deliberations and undermine the Postal Service's ability to perform its functions.

Nor does *Brinton v. Dep't of State*, 636 F.2d 600, 604 (D.C. Cir. 1980), cited by the Postal Service in its Reply brief, support a contrary result. In that case, the court held that legal opinions prepared to assist the Secretary of State in formulating foreign policy were protected under the deliberative process privilege where it was undisputed that "[t]he requested documents contain[ed] opinion rather than mere fact" and where the party seeking disclosure did "not allege the existence of factual material, not intertwined with opinion and advice." In *Brinton*, the court did not address whether disclosure of the identities of those who wrote the legal opinions would somehow reveal aspects of the deliberative process that would lead to chilling. Therefore, the Court rejects the Postal Service's reliance on the deliberative process privilege as a basis for invoking Exemption 5.

### b. The Attorney-Client Privilege

The purpose of attorney-client privilege is "to assure that a client's confidences to his or her attorney will be protected, and therefore encourage clients to be as open and honest as possible with attorneys." *Coastal States Gas Corp. v. Dept of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980). The privilege extends to all situations in which a client seeks an attorney's advice on a legal matter and protects not only the client's disclosures to an attorney but also an attorney's written communications to a client "to ensure against inadvertent disclosure, either directly or by implication, of information which the client has previously confided to the attorney's trust." *Id.*;

*see also Mead Data Central Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242 (D.C.Cir.1977).

An attorney-client privilege is established "(1) [w]hen legal advice of any kind is sought (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance, permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be waived." *U.S. v. Martin*, 278 F.3d 988, 999 (9th Cir.2002). "'Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed.'" *Id*. (quoting *Weil v. Inv./ Indicators, Research & Mgmt., Inc*. 647 F.2d 18, 24 (9th Cir.1981)).

"The privilege extends to agencies as well to the extent the agency is consulting its attorney as would any private party seeking advice to protect personal interest." *Our Children's Earth Found. v. Nat'l Marine Fisheries Serv*., 85 F. Supp. 3d 1074, 1086 (N.D. Cal. 2015) (internal citations and quotations omitted). "'In the governmental context, the 'client' may be the agency and the attorney may be an agency lawyer.'" *Rollins v. United States Dep't of State*, 70 F. Supp. 3d 546, 552 (D.D.C. 2014) (quoting *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C.Cir. 1997)). However, where an agency lawyer serves in a "mixed capacity that involves responsibilities both within and 'outside the lawyer's sphere,' the agency employee's communications will only be protected to the extent that they involve his or her professional, legal capacity." *Id*. (quoting *In re Sealed Case*, 737 F.2d 94, 99 (D.C.Cir.1984)).

"To support claims of attorney-client privilege, the agency must, in its *Vaughn* index, 'show that these documents involved the provision of specifically legal advice or that they were intended to be confidential and were kept confidential.'" *Id*. at 1087 (quoting *Nat'l Resources Def. Council v. U.S. Dep't of Def*., 388 F.Supp.2d 1086, 1104 (C.D. Cal. 2005)). Explanations in the *Vaughn* index must be tailored to specific documents rather than using boilerplate language in order for the agency to meet its burden. *Id*. (citing *Wiener v. FBI*, 943 F.2d 972, 978-79 (9th Cir. 1991)).

The Postal Service has all but conceded that the documents reflecting communications between Portonovo and Tyeryar regarding the search terms used for finding responsive documents were not for the purposes of providing legal advice to the agency. *See* Postal Service Reply at 10

31

("Recognizing that much of the search-related communications did not encompass traditional legal advice, the bulk of those communications between Ms. Portonovo and others were not redacted.") In this context, the Postal Service's theory is that specific information contained in these communications, which did not themselves relate to the provision of legal advice to the client, could be redacted because the same information was contained in *other* documents that are subject to attorney-client privilege or are protected as work product. The Court has found no authority, however, that suggests a piece of information that is contained in a document created by an attorney but not in connection with the provision of legal advice to a client can be redacted under the attorney-client privilege on the basis that the same information is contained in other communications that *are* subject to attorney-client privilege.

Second, and more broadly, the Postal Service's redaction of the names, titles and email addresses that Carlson seeks flies in the face of the rule that in cases that involve "normal discovery" "[t]he [attorney-client] privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). Thus, in *Upjohn*, the Court found that application of the attorney–client privilege to communications between corporate counsel and employees in connection with an internal investigation conducted by counsel "put[] the adversary in no worse position than if the communications had never taken place." *Id*. According to the Court, this was because "'[t]he client cannot be compelled to answer the question, "What did you say or write to the attorney?" but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.'" *Id.* (quoting *Philadelphia v. Westinghouse Electric Corp*., 205 F.Supp. 830, 831 (E.D. Pa. 1962)). Similarly, in the FOIA context, the government's right to withhold attorney-client communications in response to a FOIA request does not entitle it to withhold basic facts to which a litigant in a civil action would be entitled. *See Nat. Res. Def. Council v. U.S. Dep't of Def.*, 442 F. Supp. 2d 857, 877 (C.D. Cal. 2006) ("Holding the government to its burden of segregation is especially important when Exemption 5 is invoked, because the public has a vital interest in knowing the facts that are available to the agency") (citations omitted). Therefore, the Court

rejects the Postal Service's reliance on the attorney-client privilege in support of its redactions under Exemption 5.

### c. The Work Product Privilege

The work product doctrine is governed by Rule 26(b)(3) of the Federal Rules of Civil Procedure, which provides, in relevant part:

> (A) **Documents and Tangible Things**. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
>
> (i) they are otherwise discoverable under Rule 26(b)(1); and
>
> (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

Fed. R. Civ. P. 26(b)(3). Rule 26(a)(1), in turn, governs initial disclosures and requires that "a party must, without awaiting a discovery request, provide to the other parties:(i) the name and, if known, the address and telephone number of each individual likely to have discoverable information – along with the subjects of that information  –  that the disclosing party may use to support its claims or defenses . . . ."

The work product rule is not a privilege but a qualified immunity protecting from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation. *Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona*, 881 F.2d 1486, 1494-95 (9th Cir. 1989) (citing Fed.R.Civ.P. 26(b)(3)). Thus, work product materials may be ordered produced "upon an adverse party's demonstration of substantial need or inability to obtain the equivalent without undue hardship." *Id*. (citing *Upjohn*, 449 U.S. at 401). "If a court orders disclosure of work product, however, 'it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.'" *Moreno v. Autozone, Inc.*, No. C-05-4432 CRB (EMC), 2008 WL 906510, at *1 (N.D. Cal. Apr. 1, 2008) (citing Fed.R.Civ.P. 26(b)(3)(B)). Consequently, "opinion work product," as opposed to "fact work product," is "typically considered core work product" and requires a

33

heightened showing of extraordinary circumstances" to overcome work product protection." *Id.*

(citing *In re Green Grand Jury Proceedings*, 492 F.3d 976, 980 (8th Cir.2007); *In re Cendant*

*Corp. Sec. Litig.,* 343 F.3d 658, 664 (3d Cir.2003)).

The main purpose of the conditional protection available under the work product doctrine

is to "prevent exploitation of a party's efforts in preparing for litigation." *Id.* (citing *Hewlett–*

*Packard Co. v. Bausch & Lomb, Inc*., 116 F.R.D. 533, 538 (N.D.Ca.1987) (concluding that

principal function of work product rule is to force each side to do its own work); 8 C. Wright & A.

Miller, Federal Practice and Procedure § 2021 (1970)). Thus, the principal difference between the

attorney-client privilege and the work product doctrine, in terms of the protections each provides,

is that the privilege cannot be overcome by a showing of need, whereas a showing of need may

justify discovery of an attorney's work product." *Id.* (citing Saltzburg, Corporate and Related

Attorney-Client Privilege: A Suggested Approach, 12 Hofstra L.Rev. 279, 299 (1984)).

"To qualify for work product protection, documents must: (1) be 'prepared in anticipation

of litigation or for trial' and (2) be prepared 'by or for another party or by or for that other party's

representative.'" *United States v. Richey*, 632 F.3d 559, 567-68 (9th Cir. 2011) (quoting *In re*

*Grand Jury Subpoena, Mark Torf/Torf Envtl. Mgmt. (Torf),* 357 F.3d 900, 907 (2004)). Where a

document serves a dual purposes, that is, it was not prepared *exclusively* for litigation, courts ask

whether the document was prepared "because of litigation" to determine if it satisfies the first

prong of the work product test. *Id.* In *Torf*, the Ninth Circuit described this test as follows:

> This formulation states that a document should be deemed prepared
> "in anticipation of litigation" and thus eligible for work product
> protection under Rule 26(b)(3) if "in light of the nature of the
> document and the factual situation in the particular case, the
> document can be fairly said to have been prepared or obtained
> because of the prospect of litigation."

357 F.3d at 907 (quoting Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 Federal

Practice & Procedure § 2024 (2d ed. 1994) ("Wright & Miller")). Drawing on Wright & Miller,

the court explained that "[i]n the 'because of' Wright & Miller formulation, 'the nature of the

document and the factual situation of the particular case' are key to a determination of whether

work product protection applies." *Id*. at 908 (quoting Wright & Miller § 2024). In *Torf,* the court

34

United States District Court
Northern District of California

found that the dual purpose documents at issue were "entitled to work product protection because, taking into account the facts surrounding their creation, their litigation purpose so permeate[d] any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole." *Id*. at 910.

Here, it is apparent that some of the communications from which the Postal Service has redacted the information Carlson seeks, namely, the communications between Portonovo and Tyeryar, were created in the normal course of responding to Carlson's FOIA requests and *not* "because of" anticipated litigation. The vast majority of Portonovo's declaration is devoted to describing, in detail, her efforts to identify documents responsive to Carlson's FOIA requests. Portonovo Motion Decl. ¶¶ 6-12. As Portonovo describes, these efforts included email communications with Ashley Tyeryar, of ICP, who ran searches for Portonovo using the search terms Portonovo provided. *Id*. Based on the totality of the circumstances, the Court finds that the communications between Portonovo and Tyeryar would have been created in substantially the same form regardless of whether litigation was anticipated. Therefore, the Postal Service may not rely on work product protection in support of its redaction of the names, titles and email addresses Carlson seeks from these communications.

More broadly, the Court finds that the work product doctrine does not protect the names and addresses Carlson seeks even if the documents that contain that information are themselves protected under the work product doctrine. As discussed above, FOIA provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). The Supreme Court has found that "it is reasonable to construe Exemption 5 to exempt those documents, and only those documents, normally privileged in the civil discovery context." *N. L. R. B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). It is well established in the context of civil discovery that the names and contact information of witnesses must be disclosed to the opposing party, regardless of whether this information may be contained in a document that is attorney work product. *See* Fed. R. Civ. P. 26(a)(1) (A)(i) & (a)(3)(A)(i). While FOIA cases have certain characteristics that distinguish them from the typical discovery context, the Court finds no

35

authority that suggests these differences warrant a broadening of work product protection under Exemption 5 to allow the Government to protect this sort of basic information in the FOIA context. Nor has the Postal Service established that disclosure of this information is likely to reveal any attorney's "tactical and strategic" thoughts about actual or anticipated litigation. *See Mervin v. F.T.C.*, 591 F.2d 821, 826 (D.C. Cir. 1978) (finding that work product protection applies where "factual material segregated from attorney work-product is likely to reveal some of the attorney's tactical and strategic thoughts" but recognizing that "the government cannot exempt pure statements of fact from disclosure by calling them attorney work-product").

Therefore, the Court concludes that the Postal Service may not redact from its responsive documents the names, titles and email addresses of the individuals who were involved in the Incident or consulted about it under the work product doctrine.

**D. Exemption 6**

**1. Background**

The Postal Service contends, in the alternative, that it permissibly withheld the names and email addresses of the individuals who were involved in the Incident as well as other employees who were consulted during the investigation under Exemption 6 of FOIA. Postal Service Motion at 14. Under Exemption 6, FOIA "does not apply to . . . personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The Postal Service claims that the redactions of employee names in this case meet the two requirements of the statute: (1) that the information is contained in personnel, medical, or similar files; and (2) that the information's "disclosure would constitute a clearly unwarranted invasion of personal privacy" under a balancing test that weighs individual privacy against the public interest in disclosure. *Id*. at 14-15 (quoting *United States Dep't of State v. Washington Post Co.*, 456 U.S. 595, 598 (1982)).

Carlson disagrees, arguing the Postal Service has not satisfied any element of Exemption 6's requirements with respect to the individuals involved in the Incident or the other employees who were consulted after the Incident. Carlson Motion at 8.

a. Similar Files

The Postal Service claims that the emails from which employees' names and other personal information were redacted constitute "similar files" "because they consist of 'government records containing information that applies to particular individuals.'" Motion at 14-15 (quoting *Forest Serv. Emps. for Envt'l Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1024 (9th Cir. 2008)); *see also id.* at 14 n.8; Postal Service Opposition at 3. The Postal Service emphasizes that the definition of the term "similar file" is broad. *Id.* at 14 (citing *Washington Post*, 456 U.S. at 600, 602). Thus, it contends, the term encompasses names and identifying information of federal employees. Postal Service Opposition at 4 (citing *Forest Serv. Emps.*, 524 F.3d at 1024).

Carlson argues that the names do not constitute similar files in this case. *See* Carlson Motion at 8-16. While acknowledging that "[s]ome courts have found that government employee names may constitute 'similar files' within the meaning of exemption 6," Carlson Motion at 8 (citing *Forest Serv. Emps. For Envt'l Ethics*, 524 F.3d 1021, 1024 (9th Cir. 2008)), Carlson contends courts are more likely to find that the "similar file" requirement is met where "release of the information would invade privacy much in the same way that release of inherently personal and private files like medical and personnel files would" than where there is only a "mundane and routine mention of an employee's name" in a record. *Id.* at 12. Here, he asserts, the "similar files" requirement is not met because Postal Service employees do not have any expectation of privacy in their names while conducting business. *Id.* He points to the Postal Services Handbook AS-353, *Guide to Privacy, the Freedom of Information Act, and Records* Management ("Handbook"), which states that "[t]he following data is public information: the name, job title, grade, current salary, duty station, and dates of employment of any current or former Postal Service employee." *Id.* (quoting Handbook, http://about.usps.com/handbooks/as353.pdf) § 5-2(b)(1)). He also contends that one federal court has already ruled that the Postal Service must disclose the names and duty positions of its employees. *Id.* (citing *Nat'l W. Life Ins. Co. v. U.S.*, 512 F. Supp. 454 (N.D. Tex. 1980)).

Carlson further argues that the Postal Service expects the public to know employee names, pointing to the Postal Service's online complaint form that includes a space for the employee's

name, discussed above.  *See* Carlson Reply at 5.  He also points out that all Postal Service employees are required to "wear and visibly display" identification badges.  Carlson Motion at 13 (quoting *Administrative Support Manual* ("ASM") § 277.233) (found at https://www.apwu.org/sites/apwu/ files/resource-files/Administrative%20Support%20Manual% 20Issue%2013%20 (Updated% 20through%2011-2013.pdf).[15]  He also points to ASM Section 277.31, which requires:

> All personnel assigned a Form 4098-F must wear it during official duty hours displayed on the outer garment over the left breast. When this is not practicable, Form 4098 is worn in plain view on the belt or as prescribed by the installation head. In addition, at installations where postal police officers are assigned access control functions, all employees are required to display their identification to the officer on entering the facility or grounds. which display an employee's full name and portrait.

*Id.*;  *see also* Carlson Reply at 1-2.[16]  Carlson Motion at 13; *see also* Carlson Reply at 1-4. Carlson acknowledges that there is an exception for retail employees under Handbook PO-209, *Retail Operations Handbook*, at § 3-4.  Carlson Motion at 13 (citing http://www.apwu.org/sites/apwu/ files/resource-files/PO-209%20Retail%20Operations%20Handbook%2010-12%20% 28979%20KB%29.pdf).  That section states that "[n]ame tags of the retail associates are to be worn over the right breast so that the tag is visible to the customer. Employees with ID badges must wear the badges at all times; but the badges may be worn out of sight of the customer, either on the waist or as prescribed by the installation head." Handbook PO-209, *Retail Operations*

---

[15] This section states, in its entirety, as follows:

> The responsible district manager issues Form 4098-F, Employee Identification (face), or an equivalent photo identification card, to every postal employee; postal contractor; and temporary employee, including casual employees. All employees must wear and visibly display Form 4098-F or an equivalent photo identification card while officially employed and on duty (see section 277.3). All cards must include, at a minimum, the name of the employee, the facility to which they are assigned, and a photo of the employee. Each district manager is responsible for Form 4098-F or equivalent photo identification cards. Form 4098-F and equivalent photo identification cards provide visible identification of employees while on the workroom floor and serving customers outside of postal facilities. While on duty away from the facilities servicing customers, each employee must wear and display Form 4098-F or an equivalent photo identification card.

[16] Carlson acknowledges that a retail employee is not required to display his or her identification badge to the public, but asserts that such employees must nonetheless display his or her first name and that he believes neither of the Santa Cruz employees were retail employees.  Carlson Mot. at 13.

*Handbook*, at § 3-4. Carlson states, however, that he believes neither of the individuals involved in the Incident were retail employees. Carlson Motion at 13.

The Postal Service challenges Carlson's reliance on its identification badge policies to establish that employees have no expectation of privacy in their names and offers declarations by Postal Inspector Lawrence C. Dukes Jr. ("Dukes Motion Decl." and "Dukes Opposition Decl.") "explaining the employee identification security policy." Dukes Motion Decl. ¶ 3. Dukes points to ASM § 277.1, which sets forth the purpose of "identification security," stating that "Identification is issued for security control of access to postal premises and operations and to identify individuals as Postal Service employees." Dukes Motion Decl., Ex. A. He describes the Postal Service's policies governing identification badges as follows:

> In summary, employees are issued badges to identify them as employees and control access to Postal facilities. The badges allow employees to determine if an individual is authorized to access a specific Postal facility and/or control access to restricted areas. Employees whose regular duties require them to work outside of a facility, such as letter carriers, are required to wear identification badges, so that customers can identify them as Postal employees. There are exceptions to the policy, however. As stated above, an exception is granted for occupational safety and employees in a retail environment. Retail associates are allowed to conceal their identification badges, as to prevent revealing their full name to customers.

Dukes Motion Decl. ¶ 7; *see also* Dukes Opposition Decl. ¶ 4. Dukes states further that

> In my experience, mail delivery and collections are the most common offsite duties performed by postal employees (i.e., mail carriers) during which customer contact may occur. While performing postal duties offsite, employees are required to wear their postal identification badges. The purpose of wearing badges, as well as uniforms, is for customers to identify an individual as a Postal employee. The purpose is not to provide the employee's name to the general public. There may be instances in which an employee's name on his/her badge is visible to a customer, but postal policy does not require that an employee's name be displayed in a manner that the general public is always able to read an employees' name. Based on my experience, I am aware that situations may arise when customers request to see an employee's badge; however, in those situations, the employee should assess the situation and decide if it is advisable or safe to do so.

Dukes Opposition Decl. ¶ 5.

b.   The Balancing Test

The Postal Service contends that disclosure of the redacted employee names and email addresses would constitute a clearly unwarranted invasion of the employees' personal privacy under Exemption 6's balancing test, which weighs the individual's privacy interest against the public's right to disclosure.  *See* Postal Service Motion at 15 (citing *United States Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749 (1989)).  In support of this assertion, the Postal Service argues that the employees have a privacy interest in their names, that they have not engaged in any misconduct, and that they are not required to disclose their names to the general public.  *Id.* at 15-16.  On the other hand, the Postal Service asserts, Carlson has not demonstrated that there is a significant public interest in knowing the identities of the individuals involved in the Santa Cruz Incident, as this information would not give the public a better understanding of the operations of the Postal Service.  *Id.* at 17 (citing *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)).

Carlson argues that the Postal Service employees have no privacy interest in their names but that even if they did, the public interest in disclosing the names of the employees and the other employees named in the emails outweighs any minimal privacy interest that the employees' have in their names.  *See* Carlson Motion at 16, 18.

i.   The Privacy Interest

The Postal Service argues that it has demonstrated that a nontrivial privacy interest is at stake: the Postal Service employees have privacy interests in their names and in being free from harassment.  *See* Postal Service Motion at 15-17 (citing, *inter alia*, *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 501 (1994)).  The Postal Service argues that establishing an interest in being free from harassment does not require showing that harassment has occurred or will occur, but only that disclosure would result in a *potential* for harassment.  Postal Service Opposition at 7.  In particular, the Postal Service contends:

> The employees at issue here have a legitimate privacy interest in their names. They have a right to be protected from the prospect of being harassed or embarrassed during [Carlson's] plan to "investigate" the incident. The Postal Service has a duty to protect the safety and security of its employees. This duty extends to

protection from rogue investigations by members of the public seeking information on specific employees for their own personal motives.

*Id.* at 9.

In support of its contention that the employees have a privacy interest in their names and email addresses, the Postal Service relies on *Forest Service Employees*, in which the Ninth Circuit held that the United States Forest Service's redaction of employee names from a public report was permissible pursuant to Exemption 6. Postal Service Motion at 15-16 (citing *Forest Serv. Emps.*, 524 F.3d at 1022–24, 1026). According to the Postal Service, this case demonstrates that a person's status as a civil servant, even one who has been disciplined, does not eliminate his or her right to privacy. *Id.* at 16 (citing *Forest Serv. Emps.*, 524 F.3d at 1026). The Postal Service further asserts that "Exemption 6 can cover 'both the subject of the investigation and third parties such as witnesses.'" Postal Service Opposition at 9 (quoting *Wood v. FBI*, 432 F.3d 78, 86 (2d Cir. 2005)). Consequently, it contends, the individuals involved in the incident and those who were consulted after the Incident have a privacy interest in their names and email addresses.

Carlson argues that neither the employees involved in the Incident nor the other employees have a privacy interest in their names. Carlson Motion at 15-16. He points to a June 16, 2016 letter from the Postal Service's Office of the General Counsel in response to a different FOIA request stating that "[p]ostal employees' names in interoffice emails do not qualify as personnel or similar files within the meaning of [exemption 6] because none of the emails contain personal information." *Id.* at 15 (citing Carlson Motion Decl. Appendix 2). Similarly, a letter dated January 18, 2017 that he received from OIG in response to an administrative appeal concerning a different FOIA request stated that "[g]enerally, a government employee does not have a privacy interest in her name . . . [or] present or past position titles[.]" *Id.* (quoting Carlson Motion Decl., Appendix 4) (original brackets, internal quotation marks omitted, punctuation altered). The same conclusion applies here, Carlson contends: "Employees named after the incident, including employees who may have provided information about the incident, do not have a privacy interest in their names because the email messages do not contain personal information." *Id.* at 15.

Carlson argues further that even if the individuals involved in the Incident have a privacy

41

interest in their names, that interest is minimal. *See* Carlson Motion at 16. Pointing out that he knows what these employees look like, Carlson argues that he could discover their names if he saw them again by looking at their identification badge or asking the employees for their names. *Id.* According to Carlson, this context distinguishes the present matter from case law involving the privacy interests that government employees have in their names cited by the Postal Service. Specifically, Carlson asserts:

> [I]f name and appearance are two important components of a person's identity, arguably appearance is the larger component. Plaintiff already is familiar with the appearance of these employees, so their names do not reveal much about their identity that plaintiff does not already know, nor does withholding their names ensure that plaintiff cannot identify them in another way.

*Id.* Carlson further argues that the Santa Cruz employees lost their privacy interests by choosing to interact with him. *Id.* Supporting that position, Carlson asserts that the employees could have elected to let him "engage[] in a constitutionally protected activity . . . without question or harassment," but the employees confronted him and "they cannot now hope that their employer will hide their names." *Id.* at 16–17.

In his Reply, Carlson asserts that the Postal Service has submitted no evidence that its employees will be subject to harassment upon release of their names, despite asserting in its briefs that they will. Carlson Reply at 14. Carlson submits his own declaration attesting that he does not intend to contact the two employees involved in the Incident and that if he did contact any managers or supervisors, he would be doing so consistent with their role of overseeing the conduct of employees. *Id.* at 14 (citing Carlson Reply Decl. ¶ 2). He also submits a declaration of a fellow Postal enthusiast who has known Carlson for more than twenty years attesting that Carlson has a long history of respectful and appropriate conduct in pursuit of his interest in the Postal Service. Carlson Reply at 15 (citing Delaney Reply Decl. ¶¶ 2-8).

### ii.  The Public Interest

The Postal Service claims that there is no discernable public interest in the names of the Station Employees or those who participated in the Santa Cruz Incident's investigation. Postal Service Motion at 17. According to the Postal Service, a public interest in information is one that

would "'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to,'" and a FOIA requester's personal interest in information is irrelevant to the evaluation of the public's interest in disclosure of that information.  *Id.* (quoting *United States Dep't of Def. v. FLRA*, 510 U.S. 487, 497 (1994); citing *Moore v. United States*, 602 F. Supp. 2d 189, 194 (D.D.C. 2009)).  The Postal Service argues that Carlson "has not shown why the names of the [Station Employees] would result in a better understanding of the operations of the Postal Service." *Id.*  The Postal Service further argues that Carlson's dissatisfaction with the Postal Service's response to the Santa Cruz Incident and his personal interest in investigating it independently are irrelevant to the Court's determination of the present case.  Postal Service Opposition at 4 (citing *Multi Ag Media LLC v. USDA*, 515 F.3d 1224, 1231 n.2 (D.C. Cir. 2008)); *see also id.* at 6–7 (arguing that Carlson's insertion of the word *public* into his personal reasons for desiring the names of Postal Service employees does not transform that personal interest into a public interest, and that there is no indication that the Santa Cruz Incident is part of a "widespread pattern" within the Postal Service).

In taking this position, the Postal Service distinguishes this case from *Gordon v. FBI*, 388 F. Supp. 2d 1028 (N.D. Cal. 2005), in which Judge Breyer ordered the Federal Bureau of Investigation to disclose the names of individuals who were developing and implementing "no fly" lists for the Transportation Security Administration.  Postal Service Motion at 17–18 (citing *Gordon*, 388 F. Supp. 2d at 1033, 1041).  According to the Postal Service, the conduct of the individuals involved in the Incident did not involve or affect the formulation of  government policy and the documents from which their names and the names of other employees were redacted do not pertain to policy-related matters akin to the development and implementation of a "no fly" list.  *Id.* at 18.  In its Opposition to Carlson's Motion, the Postal Service argues that Carlson must demonstrate that the public interest in disclosure is *significant* and rejects Carlson's assertion (discussed below) that there is public interest in this case that is comparable to the public interests that was at stake in *Gordon*, 388 F. Supp. 2d at 1041, and *Forest Service Employees*, 524 F.3d at 1026.  Postal Service Opposition at 5–6.  According to the Postal Service:

This case does not relate to a widespread government practice (such

43

> as "no fly" lists) or a tragic event that had received significant public attention (such as a fatal fire). There is no indication of any significant public interest in learning further details about an incident involving Plaintiff outside an unopened post office . . . .

*Id.* The Postal Service concludes that its employees' "names do not shed light on the Postal Service's performance of its statutory duties." Postal Service Motion at 18.

Carlson claims that "[a] strong public interest exists in disclosing the names of" the individuals involved in the Incident. Carlson Motion at 18. In particular, Carlson argues:

> Plaintiff and other members of the public who are familiar with this incident have a compelling interest in understanding how defendant's employees treat customers who have requested that the agency provide the service level that the agency's regulations require or who have appealed to a higher level of management to overrule a flawed decision that those employees made. . . . Alternatively, the public has a significant interest in understanding the level and role of employees in defendant's organization who believe that they can confront and accost members of the public who are engaging in legal activities.

*Id.* at 18–19. Carlson argues that the purpose of FOIA is to pierce the veil of administrative secrecy and, in this case, the Postal Service is expending public resources to maintain secrecy "instead of investigating the actions of the employees and, for example, apologizing to plaintiff." *Id.* at 19.

Carlson also argues that the names of other employees mentioned in the emails "may provide additional insight" into the circumstances surrounding this litigation. *Id.* As an example, Carlson asserts that he doubts that Mr. An, the officer-in charge at the Santa Cruz Post Office, was truthful when he told Carlson that he did not know the identities of the individuals involved in the Incident. *Id.* If Mr. An was the person with whom Jeremy Watson spoke about the Incident, Carlson contends, he would gain "valuable insight for future reference into Mr. An's credibility" and he could "determine whether to contact him concerning service issues in the future or, instead, to appeal directly to a higher authority." *Id.*

Carlson argues that the Ninth Circuit's conclusion in *Forest Service Employees* that there was no significant public interest in disclosure of the names sought in that case does not apply here because in *Forest Service Employees*, the underlying events had been the subject of extensive investigation and several public reports whereas here, "nobody has properly investigated the

44

incident." Carlson Motion at 21. Carlson further asserts that "not only has defendant not produced a report, defendant is, in this litigation, withholding the record that comes closest to constituting a report . . . ." *Id.* Carlson argues that the public interest of knowing the names of employees in this case is no less than the public interest of knowing the names of TSA policymakers in *Gordon. Id.* at 20.

Carlson expands on this argument in his Reply brief after seeing – apparently for the first time – the Sutanto Letter attached to the Postal Service's Opposition brief. Carlson Reply at 7-10. He points to the representation in that letter that as of March 9, 2015, well after the informal investigation of the Incident had begun, that Mr. An did not know the identities of the individuals involved and needed more information to identify them. *Id.* at 8. Given that around this time Portonovo already knew the identities of these individuals and was conducting record searches using their names, and in light of the fact that she obtained this information from two Postal Service employees who had conducted an investigation of an incident at a post office that Mr. An was in charge of, Carlson contends the statement in the Sutanto Letter is not credible. *Id.* Carlson contends that "Mr. An could not possibly have been unaware of the findings of the investigation, especially as the OIG case number on the Sutanto Letter matches the number on one of the documents produced in response to Carlson's First FOIA request. *Id.* at 8-9. This evidence is indicative of an attempt to cover up the findings of the informal investigation, Carlson asserts, and highlights the public's interest in learning the names of the employees involved. *Id.* at 8-9.

Carlson rejects the Postal Service's assertions that the Incident implicates only Carlson personally, arguing that the relevant public interest "derives from whether disclosure would shed light on an agency's performance of its statutory duties or let citizens know what their government is up to – even if, hypothetically, plaintiff were the only person who wanted to know what the government was up to." Carlson Reply at 6. He further contends that in fact, he is not the only member of the public who wants to know what the Postal Service's employees were up to, offering a series of declarations from Postal enthusiasts who have been following Carlson's action, some of whom have had similar encounters when legally taking photographs of Postal Service facilities from adjacent properties. *Id.* (citing Delaney Decl. ¶ 12; Popkin Decl. ¶ 8; Bahnsen

45

Decl. ¶ 10; Kindahl Decl. ¶ 10; Kalish Decl. ¶¶ 16, 18 & 19). *Id.* Carlson argues that the Postal Service ignores the public interest of citizens who wish to engage in lawful activity by photographing Postal Service buildings and the public interest implicated by the possibly retaliatory conduct against him; Carlson points out that he has advocated for improvement in service by the Postal Service and there is evidence that the employees involved were aware of Carlson's past efforts. Carlson Reply at 11. He asserts that there is a statute that specifically protects Postal watchdogs, prohibiting "undue or unreasonable discrimination among users of the mails." *Id.* (quoting 39 U.S.C. § 403(c)).

### 2. Whether the "Similar Files" Requirement is Met

As noted above, FOIA Exemption 6 applies to records from "personnel and medical files and similar files." 5 U.S.C. § 552(b)(6). As the emails from which employee names and email addresses have been redacted are neither personnel nor medical files the Court must determine, as a threshold matter, whether they are "similar files." The Court finds that they are.

"The phrase 'similar files' has a 'broad, rather than a narrow meaning.'" *Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1024 (9th Cir. 2008) (quoting *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 600 (1982)). In particular, the Ninth Circuit has held that "'[g]overnment records containing information that applies to particular individuals satisfy the threshold test of Exemption 6.'" *Id.* (quoting *Van Bourg, Allen, Weinberg & Roger v. NLRB*, 728 F.2d 1270, 1273 (9th Cir. 1984)). Thus, in *Van Bourg*, the court held that a list of names and addresses of employees who had been eligible to vote in a representation election constituted a "similar record." 728 F.2d at 1273. The emails at issue here contain information that applies to particular individuals, revealing their involvement in the Incident, the investigation of the Incident, or the response to Carlson's FOIA requests. The information may not be particularly sensitive or intimate, but that is not the test for the "similar files" requirement. *See U. S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 600 (1982) ("A proper analysis of the exemption must also take into account the fact that 'personnel and medical files,' the two benchmarks for measuring the term 'similar files,' are likely to contain much information about a particular individual that is not intimate."). Further, while Carlson cites a series of cases in which

46

names of government employees were found to fall outside of the ambit of Exemption 6, those cases reached that conclusion only after balancing the privacy interests against the public interest and not on the basis that the records were not "similar files." *See, e.g., U.S. Dep't of State v. Ray*, 502 U.S. 164, 175 (1991); *Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv.*, 524 F.3d at 1027; *Judicial Watch v. Food and Drug Administration*, 449 F.3d 141, 153 (D.C. Cir. 2006); *Wood v. F.B.I.*, 432 F.3d 78 (2d Cir. 2005); *Nat'l W. Life Ins. Co. v. United States*, 512 F. Supp. 454, 461 (N.D. Tex. 1980). Therefore, those cases are not inconsistent with the Court's conclusion that the "similar files" requirement is met here.

### 3. Whether Employees' Privacy Interest Outweighs the Public Interest in Disclosure

In determining whether disclosure of information constitutes a "clearly unwarranted invasion of personal privacy," courts conduct a two-step test for balancing individual privacy rights against the public's right of access. *Cameranesi v. United States Dep't of Def.*, 856 F.3d 626, 637 (9th Cir. 2017). First, the court must "evaluate the personal privacy interest at stake to ensure 'that disclosure implicates a personal privacy interest that is nontrivial or . . . more than [ ] de minimis." *Id.* (quoting *Yonemoto v. Dep't of Vetern's Affairs*, 686 F.3d 681, 693 (9th Cir. 2011) (internal citation and quotation marks omitted)). "Second, if the agency succeeds in showing that the privacy interest at stake is nontrivial, the requester 'must show that the public interest sought to be advanced is a significant one and that the information [sought] is likely to advance that interest.'" *Id.* (*quoting Lane v. Dep't of Interior*, 523 F.3d 1128, 1137 (9th Cir. 2008) (alteration in original) (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004) (internal quotation marks omitted)). "'Otherwise, the invasion of privacy is unwarranted.'" *Id.* (quoting *Favish*, 541 U.S. at 172).

### a. Whether Employees Have a Nontrivial Privacy Interest in Their Names

To establish a non-trivial privacy interest, "[a] showing that the interest is more than de minimis will suffice." *Cameranesi*, 856 F.3d at 637-638 (citing *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 977 (9th Cir. 2009)). Thus, "a disclosure implicates personal privacy if it affects either 'the individual's control of information concerning his or her person,' *Dep't of Justice v.*

47

*Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 763, 109 S.Ct. 1468, 103 L.Ed.2d 774

(1989), or constitutes a 'public intrusion[ ] long deemed impermissible under the common law and

in our cultural traditions,'" *Favish*, 541 U.S. at 167, 124 S.Ct. 1570." *Id.*

Courts consider a variety of factors in evaluating whether a disclosure would implicate a

nontrivial privacy interest.  Where the disclosure involves a federal employee there may be a

somewhat diminished privacy interest, especially where the information sought would likely

disclose official misconduct.  *Forest Serv. Employees for Envtl. Ethics v. U.S. Forest Serv.,* 524

F.3d 1021, 1025 (9th Cir. 2008) (citation omitted).  In addition, the Ninth Circuit has "placed

emphasis on the employee's position in her employer's hierarchical structure as 'lower level

officials . . . generally have a stronger interest in personal privacy than do senior officials.'" *Id.*

(quoting *Dobronski v. FCC*, 17 F.3d 275, 278-79 (9th Cir. 1994)). Further, individuals may

possess a privacy interests in avoiding the "embarrassment, shame, stigma, and harassment" that

would arise from disclosure of information about them.  *Id.*

In *Forest Service Employees*, the Ninth Circuit addressed whether the identity of twenty-

two Forest Service employees were properly redacted under Exemption 6 from an investigative

report by the Forest Service, the Cramer Fire Report, about a serious wildfire in which two Forest

Service firefighters perished.  524 F.3d at 1022.   The report was requested under FOIA by the

Forest Service Employees for Environmental Ethics ("FSEEE"), "a self-described public interest

watchdog organization."  *Id.* at 1023.  In addition to the Forest Service's investigation, four federal

agencies had conducted investigations and multiple reports addressing the reasons for the tragedy

had been issued.  *Id.*   According to the court, the twenty-two employees whose names were

redacted in the Cramer Fire Report "were 'low and mid-level' employees." *Id.* at 1026.  "In

addition, although the Forest Service has disciplined six of these employees, none ha[d] been

accused of official misconduct and the remaining employees were merely cooperating witnesses."

*Id.*  Therefore, the court concluded as a preliminary matter that "neither the employees' status as

civil servants nor the Forest Service's disciplinary decisions strip[pped] them of their privacy

interests under Exemption 6." *Id.*

The court in *Forest Service Employees* went on to recognize that disclosure of the

48

identities of the individuals raised the "potential for harassment" by "the media, curious neighbors, and the FSEEE itself." The court noted that the FSEE planned to contact the individuals and the media would likely do the same as the fire had received "significant public attention." *Id*. This contact was likely to be unwelcome, the court found, given that none of the individuals had spoken out about the fire in the intervening years. *Id*. In finding that there was a potential for "harassment," the court pointed to the Supreme Court's recognition in *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 494 (1994) that disclosure of the home addresses of federal employees to unions who represent such employees could be subject nonunion employees to an "influx of union-related mail, and, perhaps, union-related telephone calls or visits," which gave rise to a nontrivial privacy interest on the part of the employees. *Id. (*citing 510 U.S. at 502). The court also pointed to two Ninth Circuit decisions in which the potential for "harassment" based on "unwanted commercial solicitations had been found to present a cognizable privacy interest, *Painting Indus. of Haw. Mkt. Recovery Fund v. Dep't of Air Force*, 26 F.3d 1479, 1483 (9th Cir.1994) and *Minnis v. U.S. Dep't of Agric*., 737 F.2d 784, 787 (9th Cir.1984). *Id*.

The court in *Forest Service Employees* further recognized that disclosure of the employees' identities might subject them to "embarrassment and stigma" as the Forest Service's response to the wildfire "was met with heavy criticism, particularly because the fire claimed the life of two Forest Service employees." *Id*. The court concluded that these interests were nontrivial and cognizable under Exemption 6. *Id*.

Here, there is no information in the public record as to the level in the Postal Service of the employees whose names were redacted from the responsive documents. As there also is no evidence in the record suggesting they were senior level Postal Service employees, however, the Court takes as its starting point the premise that they were not stripped of their privacy interest by virtue of the fact that they were Postal employees.

In reaching this conclusion, the Court is cognizant of the fact that the names and duty stations of Postal Service employees, by themselves, are considered public information under the Postal Service's own policies. *See* Services Handbook AS-353, Guide to Privacy, the Freedom of Information Act, and Records Management § 5-2(b)(1) ("The following data is public

United States District Court
Northern District of California

information: the name, job title, grade, current salary, duty station, and dates of employment of any current or former Postal Service employee."). Thus, in *National Western Life Insurance Company v. United States*, the court found that a "bare list of names" of Postal Service employees and duty stations was subject to disclosure under FOIA on the basis that "[i]It [could not] be seriously contended that postal employees have an expectation of privacy with respect to their names and duty stations." 512 F. Supp. 454, 461 (N.D. Tex. 1980). The court noted further that "[t]he names and addresses of the employees of virtually every other federal agency are disclosable, and in fact, many are routinely published and made available through the Government Printing Office." *Id*. In this case, however, what Carlson seeks is not a bare list of names. Instead, he seeks the names and email addresses of Postal Service employees in order to link it with other information in the emails, which will disclose their involvement in or connection to the the Incident and the subsequent investigation. Therefore, the Court concludes that the lack of a privacy interest as to the names alone does not mean there can be no privacy interest as to the employees whose names were redacted by the Postal Service in response to Carlson's FOIA Requests.

Further, the Court finds that there is some potential for "harassment" as that term has been used by the courts. As the discussion of harassment in *Forest Service Employees* reflects, this term when used in connection with Exemption 6 does not require that potential conduct with individuals whose identity is at issue need be in any way threatening or even improper – it must only be unwanted. The Postal Service has not offered any evidence that suggests that Carlson has ever engaged in any threatening, or even improper conduct, in connection with his advocacy efforts. Indeed, remarkably absent from the numerous declarations submitted by the Postal Service is any statement suggesting that anyone at the Postal Service has had encounters with Carlson that might be considered "harassing" as that word is used in the everyday sense, much less threatening. Nor is there any evidence that the employees involved in the Incident perceived Carlson as threatening. There is no evidence in the record, for example, that the photographer notified anyone at the Postal Service of a potential threat at the time of the relevant events. What the record does reflect, however, is that Carlson has submitted over a thousand letters to the Postal

50

Service and has submitted hundreds of FOIA requests. While not improper, this sort of attention is likely to be unwanted by these individuals, just as the attention of the FSEE would have been in *Forest Service Employees*. Given the low threshold for establishing a privacy interest, the Court concludes this is sufficient to establish a nontrivial privacy interest.

While there is a privacy interest at stake, however, the Court finds that it is not particularly strong. As the Postal Service itself points out, this case (in contrast to the circumstances in *Forest Services*) does not involve an incident that attracted significant public attention, and there is no tragic loss of life associated with the Incident that might give rise to shame or embarrassment from disclosure. Nor does it appear that anyone at the Postal Service was disciplined or found to have engaged in misconduct such that they would have a heightened interest in protecting their identities from disclosure. Even the attention from Carlson that may result from disclosure does not raise the specter of a serious invasion of privacy as Carlson's long history of advocacy reflects that he typically uses official Postal Service channels. Nonetheless, the Court concludes that the privacy interest of the employees is sufficient to satisfy the first step of the test for applying Exemption 6.

b. Whether the Public Interest Outweighs the Employees' Privacy Interest

Having found that the employees have a nontrivial privacy interest, the Court proceeds to the second step of the test, which asks whether the requested information is likely to advance a significant public interest that outweighs the privacy interest that is at stake. *Cameranesi*, 856 F.3d at 639. The Court concludes that there is and therefore, that Exemption 6 does not apply.

"In considering whether the public interest is significant, 'the only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would she[d] light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to.'" *Id.* (quoting *Yonemoto*, 686 F.3d at 694) (internal quotation and citation omitted)). Thus, courts have found that "information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct is not the type of information to which FOIA permits access." *Forest Serv. Emps.*, 524 F.3d at 1025. Likewise, courts "do not give weight to the FOIA requester's personal interest in

51

obtaining information '[b]ecause Congress clearly intended the FOIA to give any member of the public as much right to disclosure as one with a special interest.'" *Id.* (quoting *Dep't of Defense v. FLRA*, 510 U.S. at 496). On the other hand, there is a significant public interest if the requested information will "appreciably further the public's right to monitor the agency's action." *Id.*

Carlson does not seek information about himself in Postal Service records. Rather, he seeks the names of employees who engaged in particular conduct related to the Incident. There is conflicting evidence in the record, but a reasonable inference can be drawn from Carlson's declarations that the individual who photographed him did so *because* of Carlson's past activities, which include efforts to improve service on the part of the Postal Service. Another possible inference that can be drawn from evidence in the record is that Carlson was photographed in order to intimidate him and not because he was actually perceived as a threat. In addition, with respect to the names of those who participated in the investigation, the Sutanto Letter suggests the possibility that a supervisor at the Postal Service who told Carlson he did not know the identities of the employees involved in the Incident actually did know their identities at the time, as the records that have been produced reflect that by the time of the letter, the identities of these employees was already know by the Postal Service. The Postal Service also fails to explain why Portonovo appears to have abandoned her efforts to respond to Carlson's First FOIA request in March 2015 and only resumed her efforts when Carlson filed this action, almost a year later, which further raises the possibility that the Postal Service may have been intentionally ignoring Carlson's First FOIA Request.

To the extent that there is evidence that the conduct of the employees who were involved in the Incident may have been in retaliation for Carlson's past activities as a watchdog, which are aimed at the Postal Service's efficiency, and that those involved in responding to Carlson's subsequent inquiries may have engaged in misconduct, the Court concludes the information requested implicates a public interest and not just the personal interest of Carlson. Moreover, as Carlson has noted, his right to be free from retaliation based on his watchdog activities is embodied in the statutory prohibition against retaliation. *See* 39 U.S.C. § 403(c) ("In providing services and in establishing classifications, rates, and fees under this title, the Postal Service shall

United States District Court
Northern District of California

not, except as specifically authorized in this title, make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user.").

The Court also finds that Carlson has established that there is some interest on the part of the public in being able to photograph Postal Facilities legally and without concern that they will be subject to adverse consequences. The Postal Service's argument that its employees may, in fact, have been conducting themselves in a sensible manner when they photographed Carlson highlights this interest. *See* Postal Service Opposition at 3 n. 2 ("While the manner of doing so in this instance may have been perceived as rude, it is not inherently unreasonable to obtain a photograph of a person taking pictures and video of a post office so that, if warranted, others in authority could have information confirming the identity of the person. This could have been particularly useful if anything untoward should have later occurred at the new post office"). To the extent the Postal Service appears to be endorsing what amounts to the use of surveillance by Postal employees as to members of the public who have engaged in no wrongful conduct, the public has an interest in understanding who was involved in this Incident and how it was handled.

The Court does not find persuasive the Postal Service's reliance on *Forest Service Employees* in support of the conclusion that disclosure of the names does not implicate a significant public interest. In that case, the court found that disclosure of the names of the employees involved in the underlying events did not further a significant public interest. 524 F.3d at 1028. As discussed above, the relevant incident had been investigated by four government agencies and numerous reports had been issued. *Id*. at 1023. Further, the reports addressed the same issues FSIEE sought to investigate by contacting the individuals directly; in other words, FSIEE planned on verifying the conclusions in the reports. *Id*. at 1028. Under these circumstances, the court found that the "marginal additional usefulness" of disclosing the identities of the employees did not override their privacy interest. *Id*. In contrast to *Forest Service Employees*, no reports have been issued and no information is available to the public in this case. As a consequence, disclosure of the identities of the individuals involved, which would also allow for determination of the positions they held, will pierce of the veil of secrecy that surrounds the

Postal Service's handling of the Incident as well as the underlying incident. *See also Gordon v. FBI*, 388 F. Supp. 2d 1028, 1041 (N.D. Cal. 2005) ("The public, however, has an interest in knowing who – and at what level of the government – is working on this significant problem that affects many Americans.").[17]

Finally, as noted above, the privacy interest implicated in this case is not strong. The Court concludes that the public interests discussed above significant enough to outweigh that interest. Therefore, the Court concludes that the Postal Service has not met its burden of showing that Exemption 6 applies to the names and email addresses that the Postal Service redacted from the documents it provided to Carlson in response to his FOIA requests.

### E. Whether Carlson is a Prevailing Party

Under FOIA, "[t]he court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(1). "[A] complainant has substantially prevailed if the complainant has obtained relief through either – (I) a judicial order, or an enforceable written agreement or consent decree; or (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial."

Here, the Court finds that Carlson is the prevailing party. First, Carlson has prevailed on his summary judgment motion seeking additional disclosures with respect to the documents the Postal Service produced in response to his First and Second FOIA Requests. Second, the evidence strongly suggests that it was only because he brought this action that the Postal Service finally produced *any* documents in response to the three FOIA requests that are the subject of this action. In particular, the Portonovo Motion Declaration makes clear that the Postal Service was aware of

---

[17]The Postal Service argues that *Gordon* is distinguishable because in that case, the individuals were involved in developing policy. The current record does not provide any basis for the Court to determine the level in the bureaucracy of the individuals whose names have been redacted or to draw any conclusions as to whether the Postal Service's assertion is correct as a factual matter. Even assuming that it is, the Court notes that it appears that the Postal Service has no formal policy with respect to photographing patrons or members of the public, apparently leaving it to individual employees or managers to determine whether and when such conduct may be proper. This absence of policy is itself relevant to how the Postal Service functions and implicates the public interest, as does the conduct of the individuals who have engaged in such conduct or handled complaints about it.

the requests almost a year before Carlson filed this action but that after engaging in some initial efforts to find responsive documents stopped conducting any further search efforts, only resuming when Carlson filed the complaint in this action. The Postal Service has offered no explanation for this long delay and the timing of the Postal Service's resumption of its search for responsive documents supports the conclusion it was only because Carlson finally brought legal action against the Postal Service that the search was resumed. Because this evidence supports the conclusion that the Postal Service ignored Carlson's FOIA requests for almost a year, it is appropriate to award him his costs in this action. *See Elec. Privacy Info. Ctr. v. United States Dep't of Homeland Sec.*, 218 F. Supp. 3d 27, 41 (D.D.C. 2016) ("[w]hile '[t]he mere filing of the complaint and the subsequent release of the documents is insufficient to establish causation,' a significant delay by the agency in complying with FOIA may provide the 'inference that the agency forgot about, or sought to ignore, a FOIA requester's request—and in such a case an award of [FOIA] costs and fees would be appropriate.'").[18]

## IV. CONCLUSION

For the reasons stated above, Carlson's Motion is GRANTED. The Postal Service's Motion is DENIED. The Postal Service shall provide to Carlson within **thirty (30)** days of the date of this Order the same responsive documents it previously produced in response to the First and Second FOIA Requests but without redaction of the names, titles and email addresses of the Postal Service employees discussed above, namely, the two employees who were involved in the underlying Incident and the employees who were mentioned in the subsequent internal communications about the Incident. Carlson may file a Bill of Costs with the Clerk's Office pursuant to Civil Local Rule 54-1 as the prevailing party in this action. The Clerk is instructed to

---

[18] Because Carlson requests only his costs the Court need not address whether an attorney plaintiff who represents himself may recover attorneys' fees under FOIA's fee-shifting provision. *See* Carlson Motion at 24 ("Plaintiff requests an award of 'litigation costs' . . . which may include court filing fee, postage, and photocopying expenses.").

55

enter judgment in favor of Plaintiff and close the file in this case.

**IT IS SO ORDERED.**

Dated: August 18, 2017

_____
JOSEPH C. SPERO
Chief Magistrate Judge